UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 04-10536

| | |
|---|---|
| JEANNE M. IWATA, | ) |
|   Plaintiff | ) |
| v. | ) |
| INTEL CORPORATION | ) |
| and MATRIX ABSENCE | ) |
| MANAGEMENT, INC., | ) |
|   Defendants | ) |

**PLAINTIFF'S OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS COMPLAINT
FOR FAILURE TO STATE A CLAIM**

The plaintiff, Jeanne M. Iwata, hereby opposes the defendants' motion to dismiss her complaint for failure to state a claim. She shall respond in turn to each of the arguments advanced in support of that motion.

*Introduction*

The defendants' motion begins by grossly mischaracterizing what the plaintiff says caused her problems in the first place.

> According to Iwata, she became totally disabled due to a mental illness after she witnessed a co-worker threaten to "get a gun permit." Iwata alleges that this incident caused her to become fearful and "profoundly depressed."
>
> Defendants' Memorandum of Law, p.1

In fact, what Jeanne Iwata described in her Complaint as was far worse: She alleges that what led to her disability was *Intel's response* to her report of an employee's discussion with her, as a company nurse at Intel's Hudson, Massachusetts facility. That employee had told her that he was going to get a gun permit and that "My crazy Brazilian son-in-law, who has a gun, says that we need to come in here and take care of things."

In addition, Ms. Iwata alleges that:

> 26.   Although the plaintiff correctly followed company policy, Intel's security manager dismissed the plaintiff's concerns about the employee as "just one data point and no threat."

. . .

> 30.   On February 5, 2001, the plaintiff received a telephone call from the other nurse practitioner, who informed her that the employee in question had sent the two of them an email.
>
> 31.   The email read as follows:
>
>> "Good morning folks.
>> I am in the process of an open door discrimination complaint against the managers I worked for in Hudson. Because of this, *I have been in contact with a corporate Intel HR person. This person told me last week that one of the nurses in Hudson told him or someone in Hudson, something about me getting a gun. The HR person wouldn't tell me which nurse supposedly made the statement. The reason I am writing this note to the two of you is because the two of you are the only nurses I normally interact with. I find it hard to believe that one of you folks would make such a statement. . . . If one of you said it, please be brave enough to admit it so that I may regain my respect for the other. . . .* "
>>                                                       [emphasis added]

This e-mail was sent less than a month and a half after Michael McDermott's December 26, 2000 rampage at a Wakefield, Massachusetts firm, Edgewater Technology, in which he killed 7 co-workers. It is almost inconceivable that five weeks after that massacre had occurred, an Intel Human Resources manager would tell someone who made a similar threat that his threat had been reported *in a way that narrowed down who had reported it to one of two people.* That kind of conduct exceeds any kind of negligence and should not be protected under the employment laws.

It is important to emphasize that Jeanne Iwata's harm was not caused by having witnessed a threat. It was caused by her employer's having sloughed off her report of the threat and then subsequently aimed the person who made the threat at her. As a consequence, the plaintiff was doubly-victimized when Intel used the disability it itself had caused to terminate her benefits on the basis that she was not hospitalized and thus was not entitled to receive benefits after two years.

The defendants' longer statement of the facts covers some of this, but only after an introduction that sets a deceptive tone.

## Argument

*Equal Employment Laws Prohibit Invidious Discrimination*

Jeanne Iwata seeks equal treatment as an individual with a mental disability with that accorded to those with physical disabilities. In general, discrimination law does not prohibit discriminations that serve legitimate purposes. What the law prohibits are "invidious" discriminations that do not.

The plaintiff submits that discrimination against mental disabilities is an "invidious" discrimination that serves no legitimate business or public justification but merely reinforces prevailing social prejudices. Given the preference of the medical profession, and society, for handling mental disabilities—like physical disabilities—through the use of medication rather than institutionalization, any disability insurance policy that conditions receipt of long-term disability benefits for mental disabilities on institutionalization—as here—

smacks of a distrust that mental disabilities are genuine, and constitutes an improper effort to second-guess doctors' decisions. A policy that "plays doctor" and reinforces primordial fear and prejudice against the mentally disabled, seeking to punish them by requiring them to be confined, cannot be sanctioned by our laws.

The various counts contained in the plaintiff's complaint address this discrimination under different legal avenues that amount to a single cause of action. As a backdrop to many of them, whether the Americans with Disabilities Act prohibits discrimination in benefit eligibility against those with mental disabilities is a question that the First Circuit Court of Appeals has not yet decided, and one that underlies all of the federal claims here,

A Supreme Court case that bears on this issue that has largely been ignored is *Olmstead v. L.C. by Zimring*, 527 U.S. 581 (1999). In *Olmstead*, two retarded women were institutionalized for evaluation by the State of Georgia. Their treatment professionals recommended that they moved to a community-based setting, but the state refused, citing cost justifications. The U.S. Supreme Court held that the Americans with Disabilities Act prohibits such forced confinement as *per se* discrimination.[1]

---

1. "Ultimately, in the ADA, enacted in 1990, Congress not only required all public entities to refrain from discrimination, see 42 U.S.C. § 12132; additionally, *in findings applicable to the entire statute, Congress explicitly identified unjustified 'segregation' of persons with disabilities as a 'form of discrimination.'* See § 12101(a)(2) ('historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination (continued...)

Jeanne Iwata submits that the requirement of hospitalization to receive long-term disability benefits for mental disabilities is thus prohibited under *Olmstead*.

I. THE DEFENDANTS MAY INDEED RELY IN A MOTION TO DISMISS ON THE DENIAL OF BENEFITS LETTER.

The plaintiff agrees with the defendants that they may rely in their motion to dismiss upon a letter referenced in the complaint as forming part of the case without transforming that motion into one for summary judgment. That has been recognized in this Circuit since *Fudge v. Penthouse Int'l., Ltd.*, 840 F.2d 1012, 1014-15 (1st.Cir. 1988).

While the plaintiff disagrees with the defendants about the legal import of that letter, she agrees that it may be considered in passing on this motion.

II. THE COMPLAINT STATES A CAUSE OF ACTION UNDER E.R.I.S.A. § 510 AS WELL AS § 502(A)(1)(B).

The defendants argue that the plaintiff's claim under ERISA must fail because Jeanne Iwata does not allege the sort of discrimination necessary to support an action under § 510, it cannot succeed as a claim for denial of benefits under § 502(a)(1)(B) because it is outside the terms of the plan, and because she did not bring an internal appeal first.

To address the last point first, both of the cases the defendants cite on this

---

1. (...continued)
against individuals with disabilities continue to be a serious and pervasive social problem'); § 12101(a)(5) ('individuals with disabilities continually encounter various forms of discrimination, including . . . segregation')." *(emphasis added)* 527 U.S., at 600

point acknowledge that exhaustion of internal appeals is not required if "the administrative route is futile or the remedy inadequate." (*Terry v. Bayer Corporation*, 145 F.3d 28, 40 (1998) quotes that phrase from *Drinkwater, et al. v Metropolitan Life Insurance Co., et al.*, 846 F.2d 821, 826 (1st.Cir. 1988).)

Where the claim is that the terms of the plan are facially-invalid because the language and its application are *per se* discriminatory, appeal to the claim administrator meets that description, since the plan administrator isn't in a position to make such a determination, or to grant any remedy even if it agreed.

Notwithstanding the defendants' arguments, Jeanne Iwata would have been free to bring an administrative grievance while litigating this issue in court, as the doctrine of election of remedies has been discredited,[2] nor did she have to wait for the outcome of that futile proceeding before commencing this civil action.

The answer to the question of whether this action properly belongs under § 510 or § 502(a)(1)(B) is much less complicated than the defendants suggest. The discharge of the plaintiff because she did not return from sick leave although she was still medically disabled, and the termination of her benefits, properly presents an issue which is actionable under both sections:

---

2.   In *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974), the United States Supreme Court found ample precedent for permitting an aggrieved employee to seek concurrent, overlapping remedies. In that case, which involved a civil rights claim, the Court held that even though the employee had previously pursued his claim through the grievance machinery established under the collective bargaining agreement, he was not precluded from separately maintaining a civil rights action.

- An issue under § 510 is presented because Ms. Iwata was discharged for attempting to exercise her right to long-term disability benefits, and because the terms of the plan were invidiously discriminatory,[3] and

- An issue under § 502(a)(1)(B) is presented because the additional requirement of hospitalization for mental disabilities constitutes an illegal discrimination against those with mental disabilities.

Jeanne Iwata does not demand a higher level of benefits than the employer has offered; rather she simply seeks long-term disability benefits on the same basis as any other employee, without being required to submit to a hospitalization that her doctor does not consider necessary (and which would thus not be covered under medical insurance) in order to receive the same benefits as physically-disabled individuals who are allowed to receive long-term benefits while living at home.[4]

---

3. *In Sup Choi, M.D., Plaintiff, v. Massachusetts General Physicians Organization, Inc., et al.*, 66 F. Supp. 2d 251 (D.Mass. 1999), cited by the defendants, makes it clear that discriminatory intent in the framing of a benefits plan is actionable under § 510, citing to *Aronson v. Servus Rubber, Div. of Chromalloy*, 730 F.2d 12, 16 (1st Cir. 1984), which drew the line between legitimate and "invidious" discriminations.

*Caola v. Delta Air Lines, Inc., et al.*, 35 F. Supp. 2d 47, (D.Mass. 1999), also cited by the defendants on this point, is totally irrelevant here, as that alleged that the employee was entitled to the full period of maternity leave rather than a shorter period. It was not a case that alleged discrimination, nor was it even brought under § 510.

4. The defendants' citation to cases stating that employers are not required by ERISA to provide any particular level of benefits thus misses the point. Iwata is not asking for the court to create a new level of benefits but merely to remove an illegally-discriminatory condition from a promised level of benefits.

If ERISA is to be interpreted to pre-empt state laws for the purpose of avoiding inconsistent regulation, ERISA's provisions must be interpreted consistently with other federal laws, including the Americans with Disabilities Act (discussed below), to a provide a consistent body of federal employment benefit law.

It must be remembered that ERISA was enacted not to protect employers but to allow employees to enforce employment benefit programs. In addition, ERISA was not enacted to immunize employers and insurance companies against legitimate claims by employees, but to empower employees to go to federal court to obtain their benefits. The preemption of state regulation was read into the statute as nod towards uniformity given the national scope of many employers' (and insurers') operations, but that is merely a matter of implementation, not the reason for the law.

The answer to the demand for equitable treatment of the mentally-disabled is not to say that all ERISA does is enforce contracts, but to say that contracts must be construed and enforced under ERISA consistently with other federal laws.[5]

*Shaw v. Delta Air Lines*, 463 U.S. 85 (1983), cited by the defendants, states explicitly that ERISA does not pre-empt other federal laws (463 U.S. at 105), and

---

5.  There is a strong resemblance in the arguments on either side of this debate to the arguments about whether the Constitution and Bill of Rights should be interpreted as they might have been when they were adopted (the "original intent" school favored by neoconservatives) or in the broader context of modern history.

that ERISA plans are subject to federal antidiscrimination law. Section 504 of the Rehabilitation Act expressly incorporates the protections of the Americans with Disabilities Act into its terms,

> (d) *Standards used in determining violation of section.* The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12111 *et seq.*) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. § 12201-12204 and § 12210), as such sections relate to employment.
>
> 29 U.S.C. § 794(d)

Under *Shaw v. Delta Air Lines,* ERISA must be read the same way.

The plaintiff therefore submits that ERISA should be construed to require that benefit plans not enforce invidious discrimination against the mentally disabled.

III.  THE COMPLAINT STATES A CAUSE OF ACTION UNDER THE REHABILITATION ACT.

The defendants argue that the claim under the Rehabilitation Act must be dismissed because the Complaint does not expressly allege that the defendants receive federal funding. It is not necessary to allege every fact in the complaint in order to state a claim.[6] All that is necessary is to put the defendant on notice of the basis for the lawsuit.

---

6.  As noted in one of the cases cited by the defendants, *EEOC v. Staten Island Savings Bank*, 207 F.3d 144 (2nd Cir. 2000):
    > A complaint may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).      207 F.3d at 148

As a matter of fact, however, the defendants are well aware that they are entitled to reduce the benefits they pay out to a participant in the plan dollar-for-dollar by any amounts the participant receives from Social Security. The plan is thus directly subsidized by the Social Security system, squarely meeting the requirement of federal funding.

Proof of this is a matter for trial or summary judgment, but not for a motion to dismiss.

Moreover, as to the merits of the plaintiff's claim, section 504 of the Rehabilitation Act, quoted above, expressly incorporates the protections of the Americans with Disabilities Act. This is not precluded by the Supreme Court case, *Traynor v. Turnage,* 485 U.S. 535 (1988) cited in this section by the defendants.

*Traynor* involved a conflict between the general deference to the Americans with Disabilities Act in section 504 and a provision of the G.I. Bill, 38 U.S.C. § 1662(a)(1), that grants extensions of time to use the educational benefits of the G.I., Bill to education because of "a physical or mental disability which was not the result of [their] own willful misconduct."

Given that the Veteran's Administration had long treated alcoholism as "willful misconduct," the Supreme Court decided that Congress' use of that particular phrase intentionally imported the VA's interpretation of the phrase into the G.I. Bill, and decided that the Rehabilitation Act's more general language did not override the specific language about "willful misconduct."

Further, although the defendants quote general language in *Traynor* to the

effect that the Rehabilitation act does not require that all handicapped persons have access to the same benefits, it was the Court's resolution of the "general versus specific" issue that decided the case.

In any event, this case is not pitched at a level of generality that demands that all disabled individuals get the same benefits, any more than discrimination law prohibits all distinctions between groups. The plaintiff asserts that what is prohibited under law is "invidious" discrimination, as discussed above.

IV.  THE COMPLAINT STATES A CAUSE OF ACTION UNDER THE AMERICANS WITH DISABILITIES ACT.

At the outset, the defendants admit that the First Circuit has not yet ruled on whether a long-term disability plan may offer benefits to the mentally-disabled on a more restrictive basis than to the physically-disabled.

The defendants cite cases from several other Circuits that hold that it is not illegal to offer different levels of benefits for different disabilities. Most of them justify that result by citation to the passage in *Traynor v. Turnage,* 485 U.S. 535 (1988) discussed above, which has been erroneously interpreted. Once again, the basis for the holding in that case ultimately turned on the conclusion that the specific prohibition of "willful misconduct" in the G.I. Bill overrode more general anti-discrimination language in the Rehabilitation Act.[7]

---

7.  *Ford v. Schering-Plough Corp.*, 145 F.3d 601 (3rd Cir. 1998), quoting *Traynor* at 608-609; *Lewis v. K-Mart Corp.*, 180 F.3d 166 (4th Cir. 1999), quoting *Traynor* at 171; *Parker v. Metropolitan Life Ins. Co.*, 121 F.3d 1006 (6th Cir. 1997), quoting *Traynor* at 1019; *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000), citing *Traynor* at 1118, n81.

In addition, even the contention that differential benefits is permissible is sometimes dicta—see *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000), which held at 1112 that the plaintiff couldn't sue under the Americans with Disabilities Act because she wasn't a "qualified handicapped person" able to sue under Title I (the employment provisions) and at 1115 because Title III (the public accommodations provisions) didn't cover the contents of goods and services provided by public accommodations such as insurance companies but only addressed questions of access to their premises.

The one case from within this circuit that the defendants cite, *Wilson v. Globe Specialty Products, Inc.*, 117 F.Supp.2d 92 (D.Mass. 2000) also relies, at page 96, on the quote from *Traynor* discussed above.

*Wilson v. Globe* also cites, as support for the proposition that the law does not prohibit discrimination in disability coverage between the mentally and physically disabled, the passage of the Mental Health Parity Act in 1996, which prohibits placing greater limits, in health insurance plans, on mental health benefits than on physical disability benefits.

In *Wilson*, the argument was made that because that law did not address disability insurance benefits, the intent was to not require those benefits to be equalized. It could equally be argued, however, that the law did not address those benefits because Congress believed that discrimination of that type was *already* prohibited.

The plaintiff in *Wilson* pointed to the Supreme Court's ruling in *Olmstead,*

but a key piece of the puzzle was missing in that case. The long-term benefits plan in *Wilson* did not provide for extending benefits for mental disabilities after twenty-four months if the individual was institutionalized. Thus, the key similarity between this case and *Olmstead* was lacking there.

Not every federal Circuit has agreed with the defendants' position here. The Eleventh Circuit, in *Johnson v. K Mart Corp.*, 273 F.3d 1035 (2001), ruled that a totally-disabled individual could sue under Title I of the ADA (the employment provisions) and that the provision of lesser long term disability benefits for mental disabilities than physical disabilities violates the ADA, relying on *Olmstead.*

Unfortunately, after publication of that opinion, rehearing *en banc* was ordered, and the panel opinion was vacated. Before rehearing occurred, K Mart went into bankruptcy. If the citation above case is looked up on Lexis, one only sees that history, not the opinion. It is, however, still in volume 273 F.3d on library shelves, and is available online at West's free website, findlaw.com. (A copy of the original, very well-reasoned opinion in that case, downloaded from findlaw, is attached.)

In their motion to dismiss, the defendants also implicitly acknowledge that any argument that the coverage of long-term disability coverage cannot be litigated under the ADA is no longer good law, in the light of the Supreme Court's decision in *Cleveland v. Policy Management Systems Corporation, et al.*, 526 U.S. 795, 798 (1999) and the First Circuit's decision following *Cleveland*, in *Sullivan v. Raytheon Co.*, 262 F.3d 41, 47 (1st Cir. 2001).

The defendants' attempt to invoke those cases here to require the plaintiff to explain, in accordance with those cases, why her current disabled status is not inconsistent with standing to sue (such as the possibility of recovery in the future), is improper on a motion to dismiss. Those two cases involved grants of summary judgment, based on evidentiary showings and detailed presentations of the parties positions. This is not applicable here, where the defendants have filed only a motion to dismiss. It is settled law that it is not necessary to allege every fact in the complaint in order to state a claim.[8] All that is necessary is to put the defendant on notice of the basis for the lawsuit.[9]

Given the posture of this case, both on its own and in context, this Court is free to approach the issues here *de novo*. None of the authorities presented by the defendants on the core issue of discrimination against the mentally disabled are binding authorities; all are at most persuasive authority.

At least half of the cases from other circuits cited by the defendants (*Weyer*, *Ford*, and *Parker*) follow the pattern seen here, where a disability policy requires that an individual who is diagnosed with a mental disease of defect be

---

8.  As noted in one of the cases cited by the defendants, *EEOC v. Staten Island Savings Bank*, 207 F.3d 144 (2nd Cir. 2000):
>   A complaint may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).       207 F.3d at 148

9.  As noted by the defendants, this discussion has implications for the Rehabilitation Act claim as well. As not noted by the defendants, it does not affect the ERISA claim, as there is no parallel limitation on ERISA claimants.

institutionalized to receive benefits beyond a short period.

As a matter of public policy, insurance companies and employers should not be permitted to practice medicine by ignoring doctors' diagnoses unless the individuals are institutionalized,[10] in order to cater to fear and prejudice against the mentally disabled,

The instant action involves unusual circumstances: The plaintiff alleges that the emotional stress that disabled her was caused by the extreme and outrageous conduct of Intel in telling the individual whose threat of workplace violence she had previously reported that the report had come from a nurse. The plaintiff was the nurse he had spoken to about it. Intel told him that that just over a month after the horrendous shootings at another Massachusetts technology company. It would be an injustice for this Court to permit Intel and its benefits subsidiary to terminate the plaintiff's disability benefits because of the emotional distress Intel had caused itself.

Whether this Court chooses to carve out an exception for this unusual fact pattern, or chooses to disagree with the courts that have chosen to countenance invidious discrimination against the mentally disabled, this case should not be dismissed.

Finally, as to the citation of *Tompkins v. United Healthcare of New England, Inc.*, 203 F.3d 90 (1st Cir. 2000), in that case the plaintiff had already obtained

---

10.   Questions would then arise about who would pay for those unnecessary stays.

reversal by the plan of its decision before filing in federal court. In that case the dispute was not over whether benefits were available but at which hospital—the sort of dispute that a plan administrator can resolve. As discussed in section II above, here the dispute is about the facial validity of the terms of the policy, about which a plan administrator is not in a position to grant relief, rendering internal appeals futile and not required before going to court.

V.   THE COMPLAINT STATES A CAUSE OF ACTION UNDER MASSACHUSETTS LAW.

The defendants' final argument is with the plaintiff's invocation of the Massachusetts constitution's prohibition of handicap discrimination. As authority, they point to one case from this court that was brought, not under the Massachusetts constitution but under chapter 151B.[11]

Their discussion ignores a number of important distinctions:

While it is true, because of Article VI, the United States Constitution can preempt provisions of the Massachusetts Constitution, and United States statutes can preempt Massachusetts statutes where they conflict, it is not automatically the case that United States statutes automatically preempt the Massachusetts constitution. Secondly, the Court in *Shaw v. Delta Air Lines,* 463 U.S. 85 (1983), in discussing the relationship between federal and state laws in this area, noted that state laws are not completely pre-empted. State anti-discrimination laws that are in consonance with federal anti-discrimination law are preserved as an aid to enforcement of the federal laws. To the extent that the plaintiff's claims under

---

11.   They also point to a case from another circuit.

ERISA and the Rehabilitation Act are extensions of enforcement of the antidiscrimination policies of the Americans with Disabilities Act, there is a safe-harbor within those laws for consistent state prohibitions against discrimination.

Many laws on unrelated subjects are preempted, but it is important to remember that the Court in *Shaw*, after consideration of the special case of state antidiscrimination laws, decided that such laws are not pre-empted, to the extent that both the federal an state laws could be complied with. (See 463 U.S., beginning at page 102.)

The plaintiff submits that on that analysis, her claim under Massachusetts law should not be dismissed.

## Conclusion.

The defendants' motion to dismiss should be DENIED.

> Respectfully submitted,
>
> JEANNE M. IWATA
>
> By her attorneys,
>
> /s/Paul L. Nevins
> Paul L. Nevins
> BBO No. 369930
> 47 Church Street
> Wellesley, Massachusetts 024182
> (781) 237-9018
>
> /s/Philip R. Olenick
> Philip R. Olenick
> BBO No. 378605
> 101 Tremont Street - Suite 801
> Boston, Massachusetts 02108
> (617) 357-5660