**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

**CIVIL ACTION NO. 04-10536-WGY**

JEANNE M. IWATA,                    )
   Plaintiff                         )
v.                                  )
INTEL CORPORATION                   )
and MATRIX ABSENCE                  )
MANAGEMENT, INC.,                   )
   Defendants

**THE PLAINTIFF'S SUPPLEMENTARY OPPOSITION**
**TO THE DEFENDANTS' MOTION TO DISMISS**

**Procedural history**

On May 17, 2002, Jeanne Iwata filed administrative charges of discrimination because of disability with the Massachusetts Commission Against Discrimination. Ms. Iwata also alleged unlawful retaliation by her employer because she tried to exercise her right to a medical leave. Finally, she alleged a separate violation of the Massachusetts Public Accommodations statute, M.G.L. c. 272, § 98 against Intel Corporation and Matrix Absence Management, Inc. because each unlawfully "makes . . . [a] distinction, discrimination or restriction on account of . . . a mental disability . . . "

Subsequently, in March of 2003, Ms. Iwata filed the instant *Complaint* in United States District Court. The defendants immediately countered with a motion to dismiss, to which the plaintiff filed a timely *Opposition.* In response to the District Judge's request, the plaintiff now submits this *Supplementary Opposition.*

2

## Statement Of The Facts

The plaintiff relies upon the facts set forth in her *Verified Complaint.* However, she emphasizes, for purposes of this *Supplemental Opposition*, the following:

1.    On July 20, 2001, at the request of Intel and Matrix Absence Management, Inc, the plaintiff was examined by an Independent Medical Examiner, Ronald Schouten, M.D. Dr. Schouten concluded that, "As of the date of this examination, Ms. Iwata was suffering from Major Depression, Moderate as well as Post-Traumatic Stress Disorder, Chronic. . . . She appeared to have made little progress in terms of the resolution of her symptoms . . . "

2.    The plaintiff's short-term disability leave expired on February 2, 2002.

3.    As of February 2, 2002, the plaintiff's psychologist determined that she was still totally disabled. Prior to that date, the plaintiff formally applied for long-term disability benefits under the employee disability policy which covered her.

4.    On February 22, 2002, the plaintiff's employment with Intel was terminated because of her inability to return to work.

5.    On March 20, 2002, she received a letter from Matrix Absence Management, Inc, which denied her application for Long-Term Disability Benefits because, under the language of the policy:

3

"No participant shall be entitled to a disability benefit if his or her Disability arises out of, relates to, is caused or resulted from . . . Mental, emotional of [sic] psychiatric illness or disorder of any type . . . unless he or she is confined in a mental hospital for such illness at the time a monthly disability benefit is otherwise due an [sic] payable."

## Issue presented

Must ERISA be construed in harmony with the provisions of the ADA, the Rehabilitation Act, and cognate Massachusetts ant-discrimination statutes?

## Argument

### 1. The ADA was enacted to eliminate the last vestiges of discrimination against a protected class: those with disabilities.

In enacting the Americans with Disabilities Act the United States Congress specifically found that "some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;  that historically, society has tended to isolate and segregate individuals with disabilities, and that despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.[1] In addition, Congress found that "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our

---

1.    ADA, 42 USC § 120019(a) *Findings* (1) and (2).

4

free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity."[2]

Hence, the ADA was enacted "(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities; (2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities; (3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and (4) to invoke the sweep of congressional authority, including the power to enforce the fourteenth amendment and to regulate commerce, in order to address the major areas of discrimination faced day-to-day by people with disabilities." [3]

Title I of the ADA specifically addresses discrimination in employment. Entities covered by the ADA are precluded from discriminating against otherwise qualified individuals in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment based on the disability of that individual. The term "discriminate" is defined broadly to include virtually all aspects of the employment process.[4]

---

2.    ADA, 42 USC § 120019(a) *Findings* (9).

3.    ADA, 42 USC § 120019(ba) *Purpose* (1) -(4).

4.    42 USC § 12112.

5

**a.    The ADA prohibits discrimination in the treatment of employees and the benefits they receive based upon the nature of their handicaps.**

An employer or other covered entity cannot deny a qualified individual with a disability equal access to insurance or subject a qualified individual with a disability to different terms or conditions of insurance based on disability alone, if the disability does not pose increased risks. Decisions which are not based on risk classification must be made in conformity with the nondiscrimination requirements of the ADA.[5]

**b.    A policy which arbitrarily denies any coverage to an entire class of the disabled—millions of American employees—based upon the modality of the treatment they receive—and which is not supported by reasonable medical judgment or necessity—cannot be justified on the basis of any legislative enactment.**

Under the ADA, an employer or other covered entity cannot deny a qualified individual with a disability equal access to insurance or subject a qualified individual with a disability to different terms or conditions of insurance based on disability alone, if the disability does not pose increased risks.[6] Decisions which are not based on risk classification must be made in conformity with the nondiscrimination requirements of the ADA.[7]

---

5.    Appx to 29 CFR, § 1630.16(f).

6.    29 CFR Part 1630 requires that decisions not based on risk classification be made in conformity with nondiscrimination requirements. Appx to 29 CFR § 1630.16(f).

7.    Appx to 29 CFR § 1630.16(f)

6

It has also been held that the safe-harbor provisions of the Americans with Disabilities Act (ADA) which allow some disability-based distinctions within insurance policies to be drawn by insurers does not apply to situations where an individual with a disability has been totally denied coverage of any kind; when complete denial of coverage is at issue, there are not disability-based distinctions to be considered.[8] Moreover, if the differences in coverage are disability-based or relate to an entire discrete group of disabilities, as here, the "safe-harbor" provisions will not insulate the plan against a finding of unlawful discrimination.[9]

Here, the defendants are unable to show any rational medical or scientific basis for their rule that a person who suffers from psychological disabilities may not receive long-term disability benefits after two years "unless he or she is confined in a mental hospital for such illness at the time a monthly disability benefit is otherwise due an [sic] payable."[10]

---

8.    *Anderson v. Gus Mayer Boston Store of Delaware*, 924 F. Supp. 763 (E.D.Tex., l996)

9.    *EEOC: Interim Enforcement Guidelines On Application Of ADA To Health Insurance* (June 8, 1993), reprinted in BNA FEP Man 405: 7115, 7118.

10.    Of course, this requirement is a ruse, since no reputable psychiatrist would recommend or countenance long-term confinement to a psychiatric facility for the kind of post-traumatic stress syndrome from which the plaintiff suffers, nor can the defendants point to any body of medical evidence which would justify, support or require such a course of treatment.
    In fact, the unmistakable trend across the broad spectrum of medical treatment is away from hospitalization: Even cancer-patients facing inevitable death today are sent home—to die with dignity—or to hospice.

7

**c.    The ADA prohibits invidious discrimination—such as that which stigmatizes the plaintiff and others who suffer from psychological or mental illnesses.**

As the plaintiff has previously argued, the long-term disability policy which the plaintiff has challenged smacks of invidious discrimination which perpetuates cruel stereotypes against persons who suffer from emotional disabilities and which stigmatize more than 20 million Americans. The ADA specifically provides that "Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter 1 and III of this chapter."[11]

Based upon the applicable statutes and legislative history, the plaintiff in this case—who has pled discrimination against her employer/insurer because of its classification of her and in the administration of risks—has satisfied her obligation to plead and prove that insurance practice challenged  is not consistent with state law. and has been used as "subterfuge to evade the purposes" of Titles I and III of the Act.[12]

**2.    The standards used to determine whether provisions of the ADA have been violated were extended by Congress to the Rehabilitation Act, and the identical standards must be applied.**

The definitions and prohibitions of the ADA closely parallel those of the original Rehabilitation Act and its implementing regulations. In addition, the Rehabilitation Act has been amended in several respects by the ADA and by

---

11.    42 USC § 12202(c), *Insurance.*

12.    *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir.1999), *opinion amended on denial of rehearing*, 204 F.3d 392.

8

the Rehabilitation Act Amendments of 1992[13] to conform its provisions to those contained in the ADA. Both Acts specify that the same standards shall be applied under the two statutes in determining liability,[14] and the courts have uniformly looked to cases decided under one statute when determining liability under the other.[15]

**3.    ERISA was never meant to penalize or punish employees but must be  construed as a remedial, humanitarian statue designed to create uniform standards to guarantee rights to employees and to create transparency.**

The opening section of ERISA, containing Congress' findings and declaration of policy (29 USC § 1001) makes it abundantly clear that the paramount reason the legislation was enacted to protect employees and their beneficiaries, not employers and those who administer the plans or provide services or insurance to the plans, who—far from being protected—were made *fiduciaries* for the employees and their beneficiaries.

---

13.    *Rehabilitation Act Amendments of 1992*, Pub L No. 102-569, effective Oct. 29, l992.

14.    29 USC § 794(d) (standards for determining whether § 504 (federally-funded entities) has been violated "shall be the standards applied" under ADA); 42 USC § 12117(b) (agencies with enforcement authority over two statutes directed to prevent imposition of inconsistent or conflicting standards); 42 USC § 12201(a) (nothing in ADA shall be construed to apply lesser standard than is applied under Rehabilitation Act and implementing regulations).  *See also* 42 USC § 12201(b) (ADA does not invalidate or limit remedies, rights and procedures of any federal, state or local law providing greater or equal protection for rights of individuals with disabilities).

15.    E.g., *Stone v. Mount Vernon*, 118 F.3d (2nd. Cir., 1997); *McDonald v. Dept of Public Welfare, Polk Ctr.*, 62 F.3d 92 (3rd Cir., 1995)

9

Not a word in the statute expresses a concern for the welfare of insurers or employers.[16] By contrast, ERISA contains the following important passages, such as § 1001(a), *Congressional Findings*, which after discussing harm caused by the deprivation of benefits to employees, concludes that:

> "it is therefore desirable *in the interests of employees and their beneficiaries*, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided *assuring the equitable character of such plans* and their financial soundness."                    *[emphasis added]*

The policy declaration with respect to benefit plans (b) is in accordance with that language, and is terse enough to be quoted in full:

> "*It is hereby declared to be the policy of this Act to protect* interstate commerce and *the interests of participants in employee benefit plans and their beneficiaries,* by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, *by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts.*"                    *[emphasis added]*

(Subsection (c), addressed to pension plans, is similar.)

It is important to note the emphasis in the act on the equitable character of the plans, and the invocation of fiduciary responsibility with respect thereto. Unlike bank depositors, who learn to their despair that banks are not fiduciaries for their funds but merely contracting parties, anyone who exercises discretion with respect to a pension or benefit plan is made a fiduciary by ERISA (as discussed below). The fiduciary responsibility sections of ERISA are

---

16.    The full text of § 1001 is attached hereto.

10

so key that they constitute an entire division of the statute, from 29 USC § 1101

to § 1113. Section 1104, in particular, makes it clear that the fiduciaries are to

act solely in the interest of the participants and their beneficiaries:

> "§ 1104.  *Fiduciary duties*
> (a) Prudent man standard of care.
>    (1) Subject to sections 403(c) and (d), 4042, and 4044 *[29 USCS §§ 1103(c), (d), 1342, 1344]*, a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and--
>      (A) for the exclusive purpose of:
>        (i) providing benefits to participants and their beneficiaries; and
>        (ii) defraying reasonable expenses of administering the plan;
>        . . ."

Thus, it is incontrovertible that Congress enacted ERISA to protect

employees, not employers and their agents (such as plan administrators and

insurance companies), and that the act must be construed in that fashion —

not as a shield against awarding benefits, but to insure that employees receive

benefits to which they are  entitled.

**4.    The ultimate fiduciary under ERISA is the employer; what an employer may not do, its agents may not do—and ERISA makes them fiduciaries as well.**

In the posture of the defendant's instant motion to dismiss, the

pleadings allege—and must be accepted as alleged—Matrix is the

administering agent of the Intel long-term disability policy. Therefore, it follows

that Intel is the ultimate fiduciary of the long-term disability plan.[17]

---

17.    ERISA makes it clear that *both* Intel and Matrix are fiduciaries and employers, under 29 USC § 1002, ERISA's definition section.

(continued...)

11

Federal courts have generally employed the common law agency test to
determine whether an employment relationship exists between claimant and
the defendant entity which would subject the entity to liability under Title I of
the ADA.[18]

The hiring party's right to control the manner and means of the worker's
performance are of primary importance in this common law analysis, but other
factors include the: "Skill required; the source of the instrumentalities and
tools; the location of the work; the duration of the relationship between the

---

17.    (...continued)
To start with, Matrix, like Intel, is an "employer" of Jeanne Iwata, for the
purposes of ERISA:

 "(5) The term "employer" means any person acting directly as an
 employer, or indirectly in the interest of an employer, in relation to
 an employee benefit plan) . . . "

Secondly, under the definition of "fiduciary," Intel and Matrix are both
covered, since each exercises discretion with respect to aspects of the plan (the
exclusion under subparagraph merely keeps outside registered investment
managers from being treated as fiduciaries because they choose investments):

"(21) (A) Except as otherwise provided in subparagraph (B), a
person is a fiduciary with respect to a plan to the extent (i) he
exercises any discretionary authority or discretionary control
respecting management of such plan or exercises any authority or
control respecting management or disposition of its assets, (ii) he
renders investment advice for a fee or other compensation, direct
or indirect, with respect to any moneys or other property of such
plan, or has any authority or responsibility to do so, or (iii) he has
any discretionary authority or discretionary responsibility in the
administration of such plan.
 . . . "

18.    E.g., *Johnson v. Saline*, 151 F. 3d 564 (6th Cir.,  l998); *Birchem v.
Knights of Columbus*, 116 F. 3d 310 (8th Cir.,  1997); see also *Nationwide Mut.
Ins. Co., v. Darden*, 503 U,S, 318 (l992) ( in which the Court used the same
test in a case arising under ERISA, which, like ADA defines "employee" as "any
individual employed by any employer").

12

parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."[19]

Similar tests have been applied to determine whether the defendant entity is liable for the alleged discrimination in cases where more than one entity plays a role relating to the plaintiff's employment.[20] Even an employer not otherwise subject to the terms of the ADA may nonetheless be liable for violations of the ADA's terms if the employer acted as an agent of a covered entity.[21] Finally, an employer may also be liable if its operations are so

---

19.    *Nationwide Mut. Ins. Co., v. Darden*, 503 US 318 (1992) (internal quotations omitted).

20.    E.g., *Bloom v. Bexar County, Texas*, 130 F. 3d 722 (5 Cir., 1997) (utilizing hybrid economic realities/common law control test to find that court reporter who was paid by county and worked in county courthouse was nonetheless employed by state, which had delegated absolute authority over appointment of court reporters to state district court judges); *Fields v. Hallsville Independent School Dist.*, 906 F. 2d 1017 (5 Cir., 1990) (teacher was employee of school district, which was responsible for her hiring, firing and daily supervision; state board's responsibility for teacher certification suggested no more than licensing relationship between state and teachers), cert den 498 US 1026 (1991); *Mares v. Marsh*, 777 F. 2d 1066 (5th Cir., 1985) (grocery bagger at Army commissary was not employee of Army; although Army retained right to veto selection of employees, issued regulations affecting dress and conduct, and imposed Army's equal opportunity policies, it did not hire, fire, supervise, pay, or set schedules for baggers).

21.    *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F. 3d 990, n. 4 (6th
(continued...)

13

interrelated with those of a covered entity that the two entities constitute a

single employer. [22]

**5.    Neither ERISA nor the ADA were ever intended to preempt or to narrow the application of cognate Massachusetts anti-discrimination laws —which are settled, bedrock public policies which have been publicly enunciated in our statutes and in our Constitution.**

In deciding whether a federal law pre-empts a state statute, The

Supreme Court has held that "our task is to ascertain Congress' intent in

enacting the federal statute at issue." [23] The Court has further emphasized its

view that ERISA was never intended to derogate the provisions of federal and

state anti-discrimination laws but, instead, must be read in harmony with

those statutes:

> "Given the importance of state fair employment laws to the federal
> enforcement scheme, pre-emption of the Human Rights Law would
> impair Title VII to the extent that the Human Rights Law provides
> a means of enforcing Title VII's commands. . . . If ERISA were
> interpreted to pre-empt the Human Rights Law entirely with
> respect to covered benefit plans, the State could no longer prohibit

---

21.    (...continued)
Cir., 1997) (no evidence that covered state university delegated to defendant employer authority to make employment decisions on its behalf, nor did it exercise requisite control over employer's employment decisions); *Krouse v. American Sterilizer Col.,* 126 F. 3d 494 (3rd Cir., 1997) (no evidence that insurance company acted as agent of employer).

22.    See *Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F. 3d 990, n 4 (6th Cir., 1997) (noting that two entities may also be considered joint employers if they "share or co-determine matters governing the essential terms and conditions of employment"), quoting *NLRB v. Browning-Ferris Industries*, 691 F. 2d 1117 (3rd Cir., 1982).

23.    *Shaw v. Delta Airlines*, 463 U.S. 85, at 10-32 (1983).

14

the challenged employment practice and the state agency would no longer be authorized to grant relief . . . ”[24]

The legislative history of ERISA shows that ERISA was not specifically amended to include language which required nondiscrimination in ERISA plans because, as Senator Williams noted in a colloquy with Senator Mondale,

> “ . . . the thrust toward centralized administration of non-discrimination in employment must be maintained. I believe that this can be done by the Equal Employment Opportunity Commission under the terms of the existing law.”[25]

The U.S. Supreme Court thus quoted and relied upon this legislative history in holding that ERISA must be read consistently with the anti-discrimination laws.[26]

In a similar manner, nothing in the ADA will be construed to invalidate or limit the remedies, rights, and procedures of any federal law or law of any state[27] or political subdivision of any state or jurisdiction that provides greater

---

24.   *Shaw*, 463 U.S. at 102.

25.   Quoted in *Shaw*,  463 U.S.  at 104, and 119 Cong. Rec. 30409 (1973).

26.   Of course, since ERISA's sponsors made it clear that it did not displace pre-existing anti-discrimination laws, it certainly cannot displace later-enacted anti-discrimination laws like the ADA. If anything, the ADA's later enactment would have to be taken as giving it greater precedence than ERISA in any conflict between the statutes.

27.   The term "state" means each of the several states, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands.   ADA, § 3(3) (42 USC § 12102(3).

15

or equal protection for the rights of individuals with disabilities than are afforded by the ADA.[28]

The ADA provision which leaves intact the protections afforded under other laws[29] allows a plaintiff to choose to pursue employment-related claims under a state law that does not confer greater substantive rights, or even confers fewer substantive rights, than does the ADA, if the plaintiff's situation is protected under the state law and the remedies are greater.[30] This provision permits a plaintiff to join a state tort claim in a case brought under the ADA.

The Massachusetts Fair Labor Practices Act, M.G.L. c. 151B, was enacted by the Massachusetts General Court, and intended as a comprehensive, remedial law to eradicate the vestiges of discrimination from the workplace. As such, this Court is required to apply Massachusetts case law as those authorities construe M.G.L. c. 151B with respect to Jeanne Iwata's claims under that statute. The mandate of the Massachusetts Fair Employment Practices Act—which has been consistently reaffirmed by the Supreme Judicial Court—requires that its provisions be construed broadly, as set forth in M.G.L. c. 151B, § 9: "The provisions of this act shall be construed liberally for the accomplishment of the purposes thereof . . . "

---

28.   ADA, § 501(b) (42 USC § 12201(b); 29 CFR § 1630.1(c)(2).

29.   ADA, § 501(b) (42 USC § 12201(b )).

30.   See, for example, NY CLS Executive Law § 296(1)(a), which provides that it is an unlawful discriminatory practice for an employer to discriminate because of the disability of any individual in the terms, conditions, or privileges of employment.

16

Similarly, Article 114 of the Massachusetts Constitution bars discrimination "under any program or activity in the Commonwealth." Although the case law interpreting this amendment is sparse, the remedial provisions of M.G.L. c. 151B have been held to be sufficiently broad to accomplish the purpose of that amendment.[31]

Neither M.G.L. Chapter 151B or Article 114 of the Massachusetts Constitution were intended—nor were they enacted—to directly regulate an ERISA benefit-plan, but were enacted to outlaw unlawful, discriminatory practices, irrespective of the manner or guise in which such practices present themselves.

**6.      Courts must be the court of last resort to ensure that public policies, enacted into law by the legislature, are given their full effect.**

The defendants' interpretation of ERISA is at loggerheads with that statute's plain language and that of the ADA and other federal anti-discrimination statutes. By contrast, historically, Massachusetts and United States District Courts have given a broad and liberal interpretation to remedial laws.[32] It has been held that the primary purpose of statutory construction is

---

31.      *Grubba v. Bay State Abrasives, Div. Of Dresser Industries, Inc*,, 83 F.2d 746 (1st. Cir., 1986); *Conway v. Boston Edison*, 745 F, Supp. 773 (D. Mass, 1990); *Tate v. Department. Of Mental Health*, 419 Mass. 356, 645 N.E. 2d 1159. (1995).

32.      See *Foster Medical Corp. Employees' Pension Plan v. Healthco*, 753 F.2d 194 (1st. Cir. 1985). See also *Batchelder v. Allied Stores Corp.*, 393 Mass. 819 (1985) (Batchelder II) and *Dahill v. Police Department Of Boston*, 434 Mass. 233 (2001).

17

to interpret the law so as to effectuate the intent of the legislature in enacting the law and that it is the duty of the court to ascertain the legislative intention from the language used, the evil to be remedied, and the object to be accomplished by the enactment.[33]

It is also settled law that the burden of any defense rests entirely with the employer. The defense is narrowly applied and must be founded on objective facts rather than the employer's subjective opinions.[34]

This Court has emphatically held that, with respect to disability benefits plans:

> " . . . administrators and fiduciaries have important public responsibilities. While they have a duty to shareholders to seek profit, they must do so with an awareness of the essential function that they perform in society . . . Second, the courts must decide these cases with an awareness of the social policies at stake . . . and the possibility that judges, who lack the ordinary life experience of juries, may systematically err in their evaluations of what is responsible and fair . . . "[35]

### Conclusion.

For all the above-discussed reasons, as a matter of law, the defendants' motion to dismiss should be DENIED.

---

33.  *New York Central. R. Co. v. New England Merchant National Bank*, 344 Mass. 709, 183 N.E.2d 852, 855 (1962).

34.  *Sarni Original Dry Cleaners v. MCAD*, 388 Mass. 611 (1983).

35.  *Radford Trust v. First Unum Life Insurance Company Of America*, 2004 U.S. Dist LEXIS 10918 (June 15, 2004), at 40.

18

Respectfully submitted,

JEANNE M. IWATA

By her attorneys,

/s/Paul L. Nevins
Paul L. Nevins
BBO No. 369930
47 Church Street
Wellesley, Massachusetts 024182
(781) 237-9018

and


/s/Philip R. Olenick
Philip R. Olenick
BBO No. 378605
101 Tremont Street—Suite 801
Boston, Massachusetts 02108
(617) 357-5660

August 4, 2004

19

ERISA excerpts:

## ERISA's Declared Purpose

"§ 1001.  *Congressional findings and declaration of policy*

"(a) *Benefit plans as affecting interstate commerce and the Federal taxing power.*  The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; that the operational scope and economic impact of such plans is increasingly interstate; that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations; that they have become an important factor in commerce because of the interstate character of their activities, and of the activities of their participants, and the employers, employee organizations, and other entities by which they are established or maintained; that a large volume of the activities of such plans is carried on by means of the mails and instrumentalities of interstate commerce; that owing to the lack of employee information and adequate safeguards concerning their operation, it is desirable in the interests of employees and their beneficiaries, and to provide for the general welfare and the free flow of commerce, that disclosure be made and safeguards be provided with respect to the establishment, operation, and administration of such plans; that they substantially affect the revenues of the United States because they are afforded preferential Federal tax treatment; that despite the enormous growth in such plans many employees with long years of employment are losing anticipated retirement benefits owing to the lack of vesting provisions in such plans; that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits; and that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness."

"(b) *Protection of interstate commerce and beneficiaries by requiring disclosure and reporting, setting standards of conduct, etc., for fiduciaries.*  It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries, by requiring the disclosure and reporting to participants and beneficiaries of financial and other information with respect thereto, by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit

20

plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."

"(c) *Protection of interstate commerce, the Federal taxing power, and beneficiaries by vesting of accrued benefits, setting minimum standards of funding, requiring termination insurance.* It is hereby further declared to be the policy of this Act to protect interstate commerce, the Federal taxing power, and the interests of participants in private pension plans and their beneficiaries by improving the equitable character and the soundness of such plans by requiring them to vest the accrued benefits of employees with significant periods of service, to meet minimum standards of funding, and by requiring plan termination insurance."

**HISTORY:**   (Sept. 2, 1974, P.L. 93-406, Title I, Subtitle A, §  2, 88 Stat. 832.)