UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

JEANNE M. IWATA,

          Plaintiff,

    v.

INTEL CORPORATION and MATRIX
ABSENCE MANAGEMENT, INC.

          Defendants.

C.A. No. 04-10536 (WGY)

## DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS COMPLAINT PURSUANT TO RULE 12(b)(6)

Defendants Intel Corporation ("Intel") and Matrix Absence Management, Inc. ("Matrix") (collectively "Defendants") submit this supplemental memorandum of law in support of their Motion to Dismiss the Complaint of Plaintiff Jeanne Iwata ("Iwata"). This supplemental memorandum is in response to this Court's request for briefing on the legislative histories of the Americans With Disabilities Act ("ADA") and the Employee Retirement Income Security Act of 1974 ("ERISA"). As set forth below, Iwata's Complaint should be dismissed in its entirety. The relevant legislative histories make clear that Congress has repeatedly considered over more than a decade the result Iwata urges in her Complaint and has explicitly refused to enact it.

## INTRODUCTION

Iwata contends that the hospitalization requirement for coverage of mental disabilities under Intel's Long-Term Disability Plan ("Plan") is discriminatory because no such requirement exists for physical disabilities. However, as set forth in Defendants' prior briefs in support of

their Motion[1] and as discussed during oral argument before the Court on July 15, 2004, ERISA, which governs the Plan, does not prohibit such distinctions, and, indeed, the Supreme Court has made clear that "ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits." See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 91 (1983). Further, while the Americans With Disabilities Act generally *prohibits discrimination in employment* between persons with and without disabilities, *nothing* in that statute *prohibits benefits distinctions* like the one at issue here. For this reason, every court of appeals to consider the issue has rejected claims like those asserted by Iwata, holding that the ADA does not prohibit an ERISA-governed benefit plan from providing different levels of coverage for different disabilities. See Defendants' Memorandum of Law, p. 9.

    With this law as background, the Court asked the parties at the July 15, 2004 hearing on Defendants' Motion to provide additional briefing as to whether Congress intended when it enacted the ADA to place a gloss on ERISA that effectively required plans to impose the same conditions equally on all disabilities. As described below, that legislative history is overwhelmingly clear that Congress did not implicitly, let alone explicitly, mandate that employers provide the same level of benefits for all disabilities on the same terms and conditions. To the contrary, Congress explicitly considered the issue when enacting the ADA and determined that employers would be free to do exactly as Defendants did in this case, namely to make distinctions in coverage between different illnesses and injuries. This legislative history is consistent with the fact that whenever Congress has sought to mandate that benefit plans provide certain coverages, it has amended ERISA and expressly stated such mandates.

---

[1]  Defendants filed their original Memorandum of Law on May 6, 2004 and their Reply Memorandum on June 21, 2004.

Further, since the enactment of the ADA, Congress has repeatedly considered legislation which would have required group health plans to provide coverage equally as between mental and physical disorders, but has repeatedly rejected such legislation. Congress was concerned that mandating particular levels of benefits would cause employees to decline coverage or employers to reduce or even eliminate benefits, thereby reducing overall insurance coverage. Because of these risks and after open debate, Congress has not passed to date any legislation requiring equal benefits, although proposed bills to that effect remain pending. Whether the benefits of such bills outweigh their costs is a matter of legislative judgment for Congress and not for the courts to decide.

Viewed in this context, Iwata's Complaint is at bottom a request that the Court nonetheless infer a cause of action where Congress has declined to create one. The law is clear that this is not the province of the judiciary.[2] Cf. Dewsnup v. Timm, 502 U.S. 410, 419-20 (1992) (court should not infer broad new remedy from congressional silence). Defendants' Motion to Dismiss should be granted in its entirety.

## ARGUMENT

I.   The Legislative History of the Americans With Disabilities Act Does Not Support Iwata's Claims

Iwata asserts that the Plan violates the ADA because it limits coverage for mental disabilities to those which require hospitalization, while no such requirement exists for physical disabilities. As described below, nothing in the ADA itself or its legislative history suggests that, in enacting the ADA, Congress intended to prohibit such distinctions and silently amend ERISA by requiring employers to treat all benefits equally.

---

[2]  Here, as described below, it is even more inappropriate, since Congress has expressly rejected mandating parity in coverage between physical and mental disorders in the context of group health plans.

A.    Iwata's Claim Is Outside the Ambit of the ADA

As a preliminary matter, while Iwata nominally asserts a claim under the ADA, her allegations do not actually state a claim under that statute. Congress limited the ADA's coverage to disabilities constituting "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 U.S.C. § 12111. The Plan's coverage of "disabilities," is not coextensive with the ADA's definition and instead provides its own definition for that term. See Defendants' Memorandum, Ex. 1. While Iwata contends that she is "disabled" within the meaning of the Plan and therefore entitled to benefits, she does not allege that she is "disabled" as defined under the ADA. See generally Complaint.

That distinction highlights that Iwata's claim of discrimination is necessarily outside of the scope of the ADA. According to Iwata, the Plan, in choosing to cover both mental and physical impairments, was obligated to provide benefits for both on equal terms. Because Iwata contends that the Plan had this obligation, regardless of whether those impairments constituted "disabilities" under the ADA, her claim is necessarily premised on something other than the statute. While it appears from her papers that Iwata's claim rests on some hoped for intersection between the general purposes of the ADA and ERISA, no such intersection exists.

B.    The Legislative History Shows That Differing Coverage Is Permissible Under the ADA

Even if Iwata limited her argument to only those "disabilities" covered by the ADA, the legislative history of the statute demonstrates that Congress did not intend the result sought by Iwata here. To the contrary, that history suggests that Congress expressly contemplated the opposite: that employers would be free to provide for different coverage for different illnesses, injuries or disorders. Specifically, during joint congressional hearings on the ADA, a witness stated to Congress that "[e]mployers should only be obligated to offer the same benefits package

4

to all employees" and raised concerns that if the ADA required otherwise, it "would be prohibitively expensive and result in insurance companies being unable to provide and/or underwrite group health plans." See Americans With Disabilities Act of 1989: Joint Hearing on H.R. 2273 Before The Subcommittees on Select Education and Employment Opportunities of the Committee on Education and Labor, 101st Cong. (July 18, 1989) (statement of Brother Philip Nelan), reprinted in Arnold & Porter Leg. History: P.L. 101-336, *108. The Senate Committee Report and the two House Committee Reports on the ADA expressly responded to these concerns by making clear that "it is permissible for an employer to offer insurance policies that limit coverage for certain procedures or treatments" and that the ADA did not prohibit such differing limitations. H.R. Rep. No. 101-485 (II) (1990), reprinted in 1990 U.S.C.C.A.N. 303, 341; H.R. Rep. No. 101-485 (III) (1990), reprinted in 1990 U.S.C.C.A.N. 445, 460; S. Rep. 101-116 at 29 (1989). Indeed, the Senate Committee Report states that an example of a permissible limitation is "only a specified amount per year for mental health coverage." Id. The Committee Reports explain that the ADA only mandates that "[a]ll people with disabilities must have equal access to the health insurance coverage that is provided by the employer to all employees," and to the extent that a benefit plan places different limitations on different illnesses or injuries, the ADA only requires that such limitations apply equally to persons with or without disabilities. See H.R. Rep. No. 101-485 (II) (1996), reprinted at 1990 U.S.C.C.A.N. at 341; see also H.R. Rep. No. 101-485 (III), reprinted at 1990 U.S.C.C.A.N. at 461.

Thus, consistent with the statutory language itself, the Committee Reports show that, in enacting the ADA, Congress did not intend to alter the existing state of the law under ERISA (of which Congress was presumptively aware), which permits different coverage for different

5

disabilities. In response to concerns that the ADA would in fact change that law, Congress made

clear that such distinctions would continue to be permissible after the enactment of the ADA.

C.    The EEOC's Interpretation of the ADA Is Consistent With this Legislative
      History

The Equal Employment Opportunity Commission's ("EEOC") interpretation of the ADA

is consistent with the legislative history of the statute. In an appendix to 29 C.F.R. § 1630,

entitled Interpretive Guidance on Title I of the Americans With Disabilities Act, the EEOC,

relying on the above Committee Reports, agreed that "it would be permissible for an employer to

offer an insurance policy that limits coverage for certain procedures or treatments" so long as the

limitations are applied equally to all participants. 29 C.F.R. § 1630, App., § 1630.5.

Further, in an enforcement guidance on the application of the ADA to employer-provided

group health plans, the EEOC again reiterated that the ADA did not prohibit distinctions in

coverage for different disabilities. The EEOC explained:

> [A] feature of some employer provided health insurance plans is a
> distinction between the benefits provided for the treatment of physical conditions
> on the one hand, and the benefits provided for the treatment of "mental/nervous"
> conditions on the other. Typically, a lower-level of benefits is provided for the
> treatment of mental/nervous conditions than is provided for the treatment of
> physical conditions. . . . Such broad distinctions which apply to the treatment of a
> multitude of dissimilar conditions and which constrain individuals both with and
> without disabilities, are not distinctions based on disability. Consequently,
> although such distinctions may have a greater impact on certain individuals with
> disabilities, they do not intentionally discriminate on the basis of disability . . .
> and do not violate the ADA.

EEOC Guidance, pp. 6-7 (footnotes omitted), attached hereto as Exhibit 1.

Defendants have not located any legislative history to suggest that Congress had a

different intent when it enacted the ADA or that the EEOC is wrong in its interpretation. In

enacting the ADA, Congress only sought to ensure that persons with disabilities had access to

employer-provided benefit plans on the same terms and conditions for receipt of benefits as

6

persons without such disabilities.  As was established at the hearing, Iwata does not contend that she was denied access to participating in the Plan or that she was personally singled out by Defendants.  In light of this legislative history, Iwata has not made out a claim under the ADA.

II.    Legislation Passed After the ADA Establishes That Congress Did Not Mandate Equal Benefits_____

      A.    When Congress Has Sought to Require Certain Benefits, It Has Done So Expressly_____

Importantly, legislation passed by Congress after the ADA's enactment reinforces the conclusion that the ADA does not mandate equal benefits for mental disabilities, as Iwata suggests.  Since 1990, whenever Congress has sought to mandate particular terms and conditions in the provision of employee benefits, it has done so expressly by amending ERISA to require such coverage (rather than by passing a stand-alone piece of legislation like the ADA).  For example, in 1996, Congress enacted the Newborns' and Mothers' Protection Act of 1996, codified at 29 U.S.C. § 1185.  That statute amended ERISA to prohibit group health plans from imposing certain limitations of coverage for hospital stays in connection with childbirth.  See 29 U.S.C. § 1185(a).  Likewise, while the ADA did not prohibit benefit plans from imposing a coverage limitation based upon a pre-existing condition, in 1996, Congress enacted the Health Insurance Portability and Accountability Act ("HIPAA"), which among other things, amended ERISA by imposing some limitations on certain exclusions.  See 29 U.S.C. § 1181.  Finally, in 1998, Congress enacted the Women's Health and Cancer Rights Act, which again amended ERISA to mandate that group health plans provide certain medical and surgical benefits related to mastectomies.  See 29 U.S.C. § 1185b.

In each of these instances, Congress enacted legislation to expressly amend ERISA to mandate certain benefits and/or to prohibit certain limitations on coverage.  These amendments

to ERISA highlight that Congress, except where it expressly says otherwise, permits employers and insurers to determine for themselves what benefits they will underwrite under employee welfare benefit plans and on what terms and conditions those benefits will be provided. ERISA thus stands alone as a "'comprehensive and reticulated statute'" governing such plans. <u>Great-West Life & Annuity Ins. Co. v. Knudson</u>, 534 U.S. 204, 209 (2002) (citing <u>Mertens v. Hewitt Assocs.</u>, 508 U.S. 248, 251 (1993)). In view of Congress's consistent approach to treat ERISA (and amendments thereto) as the vehicle by which it regulates the nature and scope of benefits coverage, courts should not read into a different statute -- here the ADA -- *ex post facto* a cause of action related to these matters about which Congress has elected to maintain its silence.

B.   The Legislative History of the Mental Health Parity Act of 1996 Underscores That Congress Did Not Intend What Iwata Seeks

Moreover, Congress's enactment of the Mental Health Parity Act of 1996 ("MHPA") establishes that it has not been silent on the particular issue of coverage of mental health conditions. The history of that amendment to ERISA makes clear that not only did Congress ***not*** mandate the result that Iwata seeks here, but it expressly rejected doing so.

The MHPA, as enacted, amended ERISA to prohibit group health plans from having different annual or aggregate lifetime limits for treatments as between mental and physical diseases or injuries. 29 U.S.C. § 1185a. The statute does not mandate any other mental health benefits; is limited to group health plans which provide coverage for medical, surgical and mental health treatment; and includes a sunset provision, making clear that it does not apply to the furnishing of such benefits on or after December 31, 2004.[3] See id.

---

[3]   While, as described *infra*, Congress has not passed any further legislation relating to mental health since the MHPA, it has repeatedly extended the sunset date of that statute (from its original date of December 31, 2001). This only reinforces the conclusion that Congress has been willing to impose upon employers and insurers the limited coverage requirements set forth in the MHPA, but has been unwilling to mandate any further benefits.

Nor is the limited nature of the MHPA accidental.  The legislative history of the MHPA makes clear that it was a compromise between the House and the Senate after the House rejected the far more ambitious piece of legislation that had been originally proposed in the Senate by Senators Domenici and Wellstone as an amendment to a bill called the Health Insurance Reform Act of 1996 (bill S. 1028) (which ultimately was enacted as HIPAA).  Unlike what was actually enacted, this amendment to S. 1028 would have mandated that group health plans provide complete parity between the treatment of mental and physical disorders.  The amendment, entitled Parity for Mental Health Services, would have amended ERISA by adding the following language:

> (a) PROHIBITION.  An employee health benefit plan, or a health plan issuer offering a group health plan or an individual health plan, shall not impose treatment limitations or financial requirements on the coverage of mental health services if similar limitations or requirements are not imposed on coverage for services for other conditions.

See Domenici (and Wellstone) Amendment No. 3681 to S. 1028, 104th Cong. (1996), reprinted in 142 Cong. Rec. S3670 (Apr. 18, 1996).  Senator Wellstone, one of the amendment's sponsors, described the amendment as follows:

> Our amendment would require health plans to provide parity in their coverage of physical and mental health.  Plans would be prohibited from requiring copays, or deductibles, for mental health benefits, or establishing lifetime limits for mental health benefits, or establishing visit limitations for mental health services unless the same restrictions apply to other health services.

142 Cong. Rec. S3589 (Apr. 18, 1996).  As originally envisioned, the amendment would thus have prohibited any distinctions between the treatment of mental and physical injuries or illnesses, at least as to *group health plans* (although it would not have imposed any restriction on *disability plans* such as the one here).

9

Although sixty-eight senators agreed to the amendment, it was ultimately rejected during

the Senate and the House conference on HIPAA, as reflected in the Conference Report.  The

Report states in relevant part:

XVIII. PARITY FOR MENTAL HEALTH SERVICES

Current law

   No provision.

House bill

   No provision.

Senate amendment

   The Senate Amendment would prohibit an employee health benefit plan, or a
health plan issuer offering a group health plan or individual health plan from
imposing treatment limitations or financial requirements on the coverage of
mental health services if similar requirements are not imposed on coverage for
services for other conditions.

   It would provide for a rule of construction that the preceding should not be
construed as prohibiting an employee health benefit plan or a health plan issuer
offering a group or individual health plan from requiring preadmission screening
prior to the authorization of services covered under the plan or from applying
other limitations that restrict coverage for mental health services to those services
that are medically necessary.

Conference agreement

   The conference agreement does not include the Senate provision.

H.R. Conf. Rep. No. 104-736 (1996), reprinted in 1996 U.S.C.C.A.N. 1990, 2051.

The Conference Report's rejection of the amendment is important for two reasons.  First,

it makes clear that Congress understood that no provision of federal law, at least as of 1996,

addressed the issue of parity for mental health services, let alone required parity.  Thus, in

Congress's view, the ADA logically could not have and did not implicitly or explicitly require

employers and/or insurers to provide equal benefits or coverage as between mental and physical

10

disabilities. Second and more importantly, the Conference Report establishes that Congress rejected the very result that Iwata seeks to achieve here through judicial action: Congress had the opportunity to require parity, at least under group health plans, but chose not to do so.

Ultimately, what did pass Congress as the MHPA represented a far more modest proposal than originally passed by the Senate. On September 5, 1996, after the House rejected the original formulation of the MHPA, Senators Domenici and Wellstone introduced a scaled-down version as an amendment to an appropriations bill. See 142 Cong. Rec. S9975 (Sept. 5, 1996). This new amendment -- like the legislation that was ultimately enacted -- only dealt with aggregate lifetime limits and annual limits in group health plans; it did not mandate full parity in benefits under such plans. Senator Domenici explained on the Senate floor that he was not offering the same legislation that had been rejected by the House in conference and instead was presenting the bill he believed House members would support. See 142 Cong. Rec. S9916 (Sept. 5, 1996). Explaining that the new bill was far more limited, Senator Domenici stated, "Essentially, this is a compromise *to begin down the path of parity* and non-discrimination for the mentally ill people in this country who have health insurance" rather than full parity itself. Id. at S9917 (emphasis added). He further stated:

> I will confess to everyone, this compromise truly -- truly -- dramatically reduced our expectations and our hopes. But we understand. We have dramatically reduced the scope.
>
> We understand that the first bill that cleared the Senate with 68 votes required the same exact coverage for the mentally ill as you provide for anyone else, for other illnesses. And we understand there was a concern about that in terms of how much it might cost. There was some concern expressed about what kind of treatment is treatment of the mentally ill. Is it just an ordinary visit to a psychiatrist because you have marital difficulties or because you have very temporary kind of depression?
>
> So what we decided to do was to scale back our desire and our hope for parity for this very important part of the American population and say let us get

> started by eliminating the hoax that exists in many cases where mentally ill people
> think they have coverage, but when you look at the fine print, the aggregate
> lifetime coverage is so small as compared to the coverage for other illnesses that
> in many cases, it is a shock . . .

Id. Likewise, Senator Wellstone, another sponsor of the amendment, explained that the new

legislation was "incremental" and not "full parity," but was an "affordable step" toward that

goal. Id. at S9918. Thus, rather than continue to press for full parity, the sponsors of the MHPA

made a conscious decision to focus on one area – aggregate lifetime and annual limits for mental

health coverage under health plans – which represented only a first step toward mandating full

mental health coverage.

Consistently, other senators acknowledged that the amendment would not eliminate any

other limitations in mental health coverage and that such other limitations would remain

permissible. Senator Kennedy stated that "[t]he amendment does not address many other special

limits on mental health services." Id. at S9919. Likewise, Senator Conrad described the

proposal as "modest" because "[i]t would not require 'parity' for copayments or deductibles or

any other aspects of health coverage." Id. at S9919-20.

This bill would later become the MHPA in its final form. After being signed into law on

September 26, 1996, Congress again reiterated what the law did not do and, more importantly,

what it, as a body, had not enacted into law regarding mental health parity. Senator Wellstone

stated, "while passage of this amendment was a historic step forward for people with mental

illnesses, the amendment was a first step and a first step only. It does not require parity for

copayments or deductibles or inpatient days or outpatient visit limits." 142 Cong. Rec. S11569

(Sept. 27, 1996). He told the Senate that "[w]e have much more work to do and I look forward

to consideration of legislation which would provide full parity for coverage for mental health and

substance abuse services." Id.

Taken together, the legislative history of the MHPA makes clear that Congress left undone the issue Iwata seeks to litigate in court. The House did not agree to the elimination of all distinctions between coverage for mental and physical disabilities under group health plans. As a result, Congress passed a far more limited piece of legislation, never reaching full parity for mental health treatment under group health plans, let alone disability plans.[4] And of course, even this "first step" would have been unnecessary if the ADA -- passed six years before the MHPA -- had somehow already addressed this issue.

III.    Legislative Efforts Regarding Mental Health Since The Enactment of the MHPA Support The Conclusion that Iwata Has No Claim Under The ADA

Legislative efforts relating to mental health since the enactment of the MHPA only reinforce the conclusion that no federal law -- neither ERISA nor the ADA -- provides for a cause of action on the facts alleged by Iwata. Since 1996, Senator Domenici and Senator Wellstone (until his death in 2002) have continued to press for full parity for mental health benefits, at least under group health plans. To date, no such legislation has passed Congress. In 2001, for example, Senators Domenici and Wellstone sponsored a bill entitled the Mental Health Equitable Treatment Act of 2001 (bill S. 543). The bill would have amended ERISA to add the following:

> IN GENERAL - In the case of a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health benefits, such plan or coverage shall not impose any treatment limitations or financial requirements with respect to the coverage of benefits for mental illness unless comparable treatment limitations or financial requirements are imposed on medical and surgical benefits.

S. 543, 107th Cong. (2001).

---

[4]  As fully discussed, *infra* p. 16, the distinction between health and disability plans is an important one. Iwata is not seeking health care coverage for her mental illness. Rather, she is seeking to have Intel pay her wages during her period of disability. This is not a benefit that Congress has ever considered despite its many amendments to ERISA.

The Committee Report from the Senate Committee on Health, Education, Labor and Pensions ("HELP") highlights the costs of the proposed legislation.  The Report states that the Congressional Budget Office ("CBO") estimated that the bill would cost the private sector about $3 billion in 2002 with that cost growing over time.  See S. Rep. No. 107-61 at 9 (2001), attached hereto as Exhibit 2.  The CBO also estimated that the amendment would cause an increase of premium costs of .9%, but did not consider or measure responses by employers to those higher premiums.[5]  According to the CBO (and as reported by the Committee), "[t]hose responses would include reductions in the number of employers offering insurance to their employees and in the number of employees enrolling in employer-sponsored insurance, changes in the types of health plans that are offered, and reductions in the scope or generosity of health insurance benefits, such as increased deductibles or higher copayments."  Id. at 10-11.  The CBO also believed that increased premium costs likely "would be passed through to workers."  Id. at 11.  The effect of this would be not only to reduce employees' take-home pay but to reduce federal tax revenues.  The CBO estimated that federal tax revenues would be reduced by about $5.4 billion dollars over 10 years.  Id.

Based on these costs, the then-ranking minority member of the HELP Committee, Senator Gregg (R),[6] stated in the Report that, while "a problem exists" regarding mental health coverage under group health plans, "there is no question that action Congress takes with this bill and others will impact access to health care."  Id., at 19.  He further stated, "If our goal is to

---

[5]  After the issuance of the committee report, the CBO amended its cost estimates.  First, the CBO explained that the estimated .9% in increased premium costs was merely an average.  Because some employers already provided for full mental health coverage and others provided none, those employers would face little or no premium cost increases.  The CBO explained that those employers that provide some mental health coverage but not enough to be in compliance with the legislation likely would face increases in premium costs higher than .9%.  Second, the CBO reported that affected plans would experience an increase of anywhere between 30 and 70% in their mental health costs.  See July 12, 2002 Memorandum, attached hereto at Exhibit 3.

[6]  Senator Gregg is now the HELP Committee chair, which may explain why, as discussed *infra*, the latest version of the bill has not proceeded out of the committee to the Senate floor.

improve access to mental services, then it is our responsibility to safeguard against any unanticipated cost consequences that undermine that goal." Id. The bill was never enacted by Congress.

In 2003, the amendment was reintroduced, this time as the Senator Paul Wellstone Mental Health Equitable Treatment Act of 2003, in honor of the late senator. See S. 1832, 108th Cong. (2003). Substantively, the bill is identical to that submitted in 2001, and, like the previous bill, Congress has yet to act on the proposed legislation. As recently as May 19, 2004, Senator Daschle explained on the Senate floor that the bill was "stuck" in committee because of fierce opposition and that opponents of the bill believed "it will drive up the cost of health coverage, which will result in more people losing their insurance." 150 Cong. Rec. S5731. While Senator Daschle disagreed with that position, his statements show that the issue is far from settled and that Congress has yet to act on the matter.

IV.    Congress, Not the Courts, Should Resolve The Policy Issues Raised by Efforts to
       Mandate Mental Health Coverage

While Congress has never reached the question of parity for disability plans, its unwillingness thus far to mandate full parity even for group health plans underscores that the matter is a legislative one, rather than one for the courts. As Congress itself has recognized, the issue of full parity is a complicated one and raises significant policy choices. The risk is that the economic costs of mandating parity in group health plans may actually reduce insurance coverage. While the politicians disagree about the extent of the costs -- each side relies on those portions of the CBO's cost estimates that support its position -- there is no dispute that requiring equal treatment for physical and mental disabilities under group health plans will cause insurance premiums to increase. Those increases may be born by employees themselves, who may decide that the increased premium costs (and the concomitant reduction in take-home pay) are not worth

15

the benefit and decline coverage altogether. Alternatively, increased premium costs may cause employers to eliminate or reduce benefits for their employees rather than bear the increased costs.[7] While Congress has not studied these issues in relation to disability plans, the same concerns exist that increased premium costs caused by Congress mandating levels of benefits could actually reduce overall insurance coverage.

Whether the benefits of mandating equality of coverage as between mental and physical disabilities are worth these potential costs is a matter best left to the legislative judgment of Congress. Thus far, Congress has determined that employers and insurers should be free, except where it has otherwise expressly spoken by amending ERISA, to determine what benefits to provide and under what terms and conditions. This allows insurers to offer employers different policies with different levels of coverage at different costs and permits employers in turn to provide coverage options for their employees. Employers and their employees thereby have flexibility to determine what benefits they can and cannot afford. Congress's refusal to alter this scheme suggests that it believes that doing so would reduce rather than further insurance coverage for employees.

While Congress has focused in the past specifically on treatment for mental illnesses under group health plans, it has not been concerned about differing coverage under disability plans. Perhaps this is because there are different policy concerns at play. In enacting the MHPA, Congress was responding to concerns that limitations of coverage in group health plans would lead to mental illnesses going untreated. Those public policy concerns do not exist under

---

[7] Iwata likely will contend that equality in benefits is necessary because otherwise the costs and risks associated with mental health coverage will be born only by those who need it. This essentially is the problem of adverse selection. Employees who have no need of mental health benefits will decline coverage, thereby shifting the costs to those that do. But whether the risks should be spread across a group of employees presents a classic underwriting question, which is best resolved by the insurers. While perhaps this is an issue to be considered by Congress, the matter is not for the courts in the first instance, as Iwata would contend.

disability plans, which provide for salary replacement payments during a period of disability, not coverage for treatment.[8]  Further, perhaps Congress has not focused on disability benefits because the law already provides for disability insurance through Social Security.  See, e.g., 42 U.S.C. § 423.  While such government-provided benefits typically are more limited than those provided to employees by their private employers, Congress's silence regarding employer-provided disability benefits can only mean that, at least for now, it is content with having employers and insurers determine for themselves what is the appropriate level of coverage and under what terms and conditions, above and beyond what Social Security already provides.

Congress's silence in this regard also is not just a matter of economics.  It also is a question of whether full parity is even workable.  As Senator Domenici acknowledged, one of the reasons the House rejected full parity for mental illnesses under group health plans in 1996 was because of concerns about line drawing.  For example, he cited to questions by the House about whether parity included treatment for an employee's marital difficulties or temporary bouts of depression.  Similar problems of line drawing exist for disability plans, since it may not be appropriate to mandate salary-replacement payments for all types of mental disorders.  Further, if coverage is too generous, disability benefits could encourage employees to remain out of work and to become dependent upon salary replacement payments.  Such an outcome reinforces the employee's continued disability rather than encourages the employee to obtain treatment for such a disability and ultimately return to work.

While perhaps the answer is that the law -- if one were ever enacted -- should only require that a plan cover serious or severe mental illnesses (such as those requiring a period of hospitalization) if it covers physical disabilities, determining where that line should be drawn is

---

[8] As the facts alleged by Iwata make clear, she is not claiming that she has not received health insurance coverage of treatment for her disability.

for the legislative process and not the courts. Again, for now, Congress has left it to employers

and insurers. Here, the Plan has resolved the issue by covering only those mental illnesses that

require hospitalization. While Iwata labels that restriction as discriminatory, the restriction is

intended to control premium costs and combat fraud and dependence.

At bottom, Iwata's complaint really is that Congress has not adopted the legislative

agenda she supports. Regardless of whether one agrees with those members of Congress who

support that agenda or those that do not, it is an agenda that raises significant policy choices, and

it is not for this Court to infer a cause of action under the ADA (where one plainly has not been

enacted) in response to Congress's silence in the ERISA context. Congress's silence can only be

viewed as its legislative judgment that the costs of mandating coverage outweigh the benefits,

and the courts should not interfere with that judgment.

V.     Iwata Does Not Allege A Cognate State Law Claim

Finally, the Court also questioned whether Iwata may have a similar cause of action

under state law. The state law equivalent to the ADA is M.G.L. Chapter 151B, which generally

prohibits discrimination in employment against persons with a "handicap." That statute does not

provide for a cause of action on the facts alleged here.

In Currie v. Hartford Life Insurance Co., C.A. No. 00-1831-H, 2002 Mass. Super. LEXIS

306 (Jan. 24, 2002), a Massachusetts Superior Court granted summary judgment to an insurer on

plaintiff's claim of discrimination under Chapter 151B based upon the terms of a long-term

disability plan. In that case, the plaintiff, an employee of the Commonwealth, was forced to

leave work as a result of her mental disability, schizophrenia. Id. at *2. Currie was informed

that her benefits under a long-term disability policy would cease, because the plan limited

benefits for mental illness to 1 year unless the person was hospitalized. Id. at *4-5. Currie

18

brought suit under the Massachusetts Constitution for denial of equal protection and substantive due process and a claim of discrimination under Chapter 151B. On the equal protection claim, the Court held that the restriction in coverage was reasonably necessary to keep premium costs at an affordable level for all state employees. Id. at *9-10. As to the Chapter 151B claim, the Court questioned why the statute was even an appropriate vehicle for the plaintiff's allegations and ultimately held that the plaintiff had failed to make out a *prima facie* case of discrimination under that statute. Id. at *16 - 19 & n.9.

While Currie would foreclose a claim under Chapter 151B, Iwata does not even pursue this avenue of relief, because, unlike in Currie, any such claim would be preempted by ERISA. In Currie, the plaintiff was a state employee and thus the long-term disability plan at issue was not subject to ERISA. See 29 U.S.C. § 1003(b). In contrast, here the Plan is undisputedly subject to ERISA. On these facts, the Massachusetts Commission Against Discrimination has already held that any claim by Iwata that the terms of the Plan constitute handicap discrimination under Chapter 151B is preempted by ERISA. See Decision, attached hereto at Exhibit 4.

Nor does Iwata have a claim under the Commonwealth's authority to regulate insurance contracts. While ERISA preemption excludes such regulation under the insurance "saving clause" (29 U.S.C. § 1144(b)(2)(a)), self-insured plans, such as the Plan here, are not subject to state insurance regulation pursuant to ERISA's "deemer clause" (29 U.S.C. § 1144(b)(2)(B)). See Metropolitan Life Ins. Co. v. Massachusetts, 471 U.S. 724 (1985). In any event, while Massachusetts law does mandate *treatment* for some mental illnesses, see M.G.L. ch. 178, § 47B, it does not mandate certain levels of coverage for disability plans.

CONCLUSION

For these reasons and those set forth in their Memorandum of Law, Defendants

respectfully request that the Court dismiss Iwata's Complaint in its entirety with prejudice and

grant such other and further relief as the Court deems just and proper.

INTEL CORP. AND MATRIX
ABSENCE MANAGEMENT, INC.

By their attorneys,


s/ Robert A. Fisher
Michele A. Whitham, BBO # 553705
Robert A. Fisher, BBO # 643797
Foley Hoag LLP
155 Seaport Boulevard
Boston, MA 02210
(617) 832-1000

Date:    August 4, 2004

CERTIFICATE OF SERVICE

I, Robert A. Fisher, hereby certify that on August 4, 2004 I caused to be served by U.S.
mail, postage prepaid, a true and correct copy of the foregoing document upon counsel of record
for each other party in this matter.

s/ Robert A. Fisher