UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                               )
JEANNE M. IWATA,               )
                               )
          Plaintiff,           )
                               )
          v.                   )  CIVIL ACTION
                               )  NO. 04-10536-WGY
INTEL CORPORATION and MATRIX   )
ABSENCE MANAGEMENT, INC.,      )
                               )
          Defendants.          )
                               )
```

MEMORANDUM AND ORDER

YOUNG, C.J.                                    December 8, 2004

In this case, an employee claims that her employment was wrongfully terminated because of her mental disability and her pursuit of long-term disability benefits, and that she is entitled to continuing receipt of long-term disability benefits under an ERISA-governed plan (the "Plan") because the Plan's two-year limitation on benefits for mental illness constitutes unlawful discrimination under state and federal law.  Intel Corporation ("Intel"), her employer, and Matrix Absence Management, Inc. ("Management"), the Plan administrator, have moved to dismiss, arguing that her complaint fails to state a claim on which relief can be granted.

**I.   FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

The plaintiff, Jeanne M. Iwata ("Iwata") alleges the following facts:

Iwata, a 52-year-old white female, worked as an occupational health nurse for Intel's predecessor in interest, Digital Equipment Corporation ("Digital"), in Hudson, Massachusetts, beginning in January 1997.  Compl. [Doc. No. 1] ¶¶ 7-9.  Intel acquired Digital the following year.  Id. ¶ 10.  Iwata's duties included reviewing the medical condition of employees seeking to return to work after a medical leave of absence, and she met all performance expectations.  Id. ¶¶ 11, 13.

In November 2000, she reported to her managers an "incident . . . involving a comment made by one employee who had expressed hostility toward Intel's managers on a number of earlier occasions."  Id. ¶ 14.  Iwata previously had to clear the employee to return to work after he had a defibrillator implanted for a cardiac disorder.  Id. ¶ 15.  Upon returning to work, the employee demonstrated performance problems and "was scheduled to go on a performance warning."  Id. ¶ 16.  The employee had alleged a workplace accident prior to going on performance warning.  Id. ¶ 17.  His personal physician kept him from working for a week, but the Intel physician made him return to work.  Id. ¶¶ 18-19.

Upon his return to work, the employee again met with Iwata, and "told her that he had had it," and that the last month at

Intel had been difficult for him.  Id. ¶¶ 20-21.  He then said
"I'm going to get a gun permit."  Id. ¶ 22.  Iwata asked whether
he was going to get a gun, to which he replied, "No.  I'm just
going to let them know that I have one.  My crazy Brazilian son-
in-law, who has a gun, says that we need to come in here and take
care of things."  Id. ¶ 23-24.

When the employee left, Iwata informed the other nurse
practitioner on duty, as well as the employee's manager, urging
that precautions be taken.  Id. ¶ 25.  Intel's security manager
dismissed Iwata's concerns.  Id. ¶ 26.  The employee later
resigned under pressure.  Id. ¶ 27.  The employee's resignation
and Intel's lack of concern about the threat he posed triggered a
severe emotional reaction in Iwata, who feared that the employee
might return and "open fire in the plant."  Id.

The employee tried to get his job back, appealing his
resignation and stating that he had resigned under duress.  Id. ¶
28.  On February 5, 2001, Iwata discovered that the employee had
sent her and the other nurse practitioner an email, which read:

> Good morning folks. . . .
> [An] HR person . . . told me . . . that one of the
> nurses in Hudson told him or someone in Hudson,
> something about me getting a gun.  The HR person
> wouldn't tell me which nurse supposedly made the
> statement.  The reason I am writing this note to the
> two of you is because the two of you are the only
> nurses I normally interact with.  I find it hard to
> believe that one of you folks would make such a
> statement. . . . If one of you said it, please be brave
> enough to admit it so that I may regain my respect for
> the other.

3

Id. ¶¶ 30-31.

Upon reading this e-mail, Iwata "became fearful, . . . experienced panic, and . . . became profoundly depressed." Id. ¶ 32. Intel exacerbated these problems by taking a "cavalier" attitude toward the e-mail. Id. ¶ 33. Iwata immediately sought counseling with Dr. Mark Sorenson, who determined on February 16, 2002, that Iwata was totally disabled and urged her to apply for short-term disability benefits. Id. ¶¶ 34-35. Dr. Sorenson recommended on numerous occasions thereafter that Iwata's short-term disability leave of absence be extended. Id. ¶ 36. On July 20, 2001, at Intel and Matrix's behest, an independent medical examiner saw Iwata and concluded that she "was suffering from Major Depression, Moderate as well as Post-Traumatic Stress Disorder, Chronic. . . . She appeared to have made little progress in terms of the resolution of her symptoms." Id. ¶¶ 37-38.

Before February 2, 2002, the date on which her short-term disability leave expired, Iwata sought long-term disability benefits under the Plan. Id. ¶¶ 39-41. On March 20, 2002, Matrix denied her application for benefits, citing the Plan's limitation of benefits for mentally ill participants to cases where hospitalization is necessary. Id. ¶¶ 43. Iwata has inherently acknowledged that she did not utilize Matrix's appeal procedure. See Pl.'s Mem. [Doc. No. 9] at 5-6.

The provision to which Matrix pointed in denying benefits read:

> No participant shall be entitled to a disability benefit if his or her Disability arises out of, relates to, is caused or resulted from . . . [m]ental, emotional o[r] psychiatric illness or disorder of any type . . . unless he or she is confined in a mental hospital for such illness at a the time a monthly disability benefit is otherwise due an[d] payable.

Compl. ¶ 43.

On February 22, 2002, Iwata's employment was terminated due to her inability to return to work. Id. ¶ 42. Iwata alleges in her memorandum, but not her complaint, that she was discharged for attempting to exercise her right to long-term disability benefits. Pl.'s Mem. at 6-7.

On April 29, 2002, the Social Security Administration determined that Iwata was completely disabled. Compl. ¶ 44. She subsequently filed an administrative complaint with the Massachusetts Commission Against Discrimination and received a right to sue letter from the EEOC on December 19, 2003. Id. ¶ 45.

Iwata filed this action on March 17, 2004. Intel and Matrix, filed their Motion To Dismiss [Doc. No. 6] on May 6, 2004. The Court held a hearing on that motion on July 15, 2004, and at the Court's request, the parties have since submitted further briefing on the relevant statutes and legislative history.

## II.  DISCUSSION

### A.  Federal Jurisdiction

This Court has subject matter jurisdiction under the Rehabilitation Act, 29 U.S.C. § 791 et seq.; Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132, 1140; and Americans With Disabilities Act ("ADA"), 42 U.S.C. § 12111 et seq.  The Court has jurisdiction over claims arising under the laws of the United States, see 28 U.S.C. § 1331, and the Massachusetts state constitutional claim falls under the Court's supplemental jurisdiction, see 28 U.S.C. § 1367.

### B.  Legal Standard

In passing on a motion to dismiss under Rule 12(b)(6), the Court must accept as true all well-pleaded allegations in the nonmovant's complaint, except in deciding certain jurisdictional questions not relevant here, and must draw all inferences in favor of the nonmovant.  See, e.g., Cooperman v. Individual, Inc., 171 F.3d 43, 46 (1st Cir. 1999).  Dismissal "is only appropriate if the complaint, so viewed, presents no set of facts justifying recovery."  Id.

Although Iwata did not attach it to her complaint, Matrix has submitted for the record the letter from Matrix to Iwata, denying her claim for long-term disability benefits.  As the parties correctly agree, the Court may consider this letter without converting the motion to dismiss into one for summary

judgment.  See Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012,

1014-15 (1st Cir. 1988); Pl.'s Mem. at 5; Defs.' Mem. [Doc. No.

7] at 5.

### C.    ERISA Claims

Intel and Matrix generally argue that Iwata has not stated a

claim under ERISA.  The first relevant provision is 29 U.S.C. §

1140 (section 510 of ERISA), which provides:

> It shall be unlawful for any person to discharge, fine,
> suspend, expel, discipline, or discriminate against a
> participant or beneficiary for exercising any right to
> which he is entitled under the provisions of an
> employee benefit plan, this subchapter, section 1201 of
> this title, or the Welfare and Pension Plans Disclosure
> Act, or for the purpose of interfering with the
> attainment of any right to which such participant may
> become entitled under the plan, this subchapter, or the
> Welfare and Pension Plans Disclosure Act.

The second relevant provision is 29 U.S.C. § 1132(a)(1)(B) (ERISA

section 502(a)(1)(B)), which permits a participant or beneficiary

to sue "to recover benefits due to him under the terms of his

plan, to enforce his rights under the terms of the plan, or to

clarify his rights to future benefits under the terms of the

plan."  The third is 29 U.S.C. § 1132(a)(3), which permits a

participant or beneficiary to bring a civil action for "other

appropriate equitable relief."

Iwata claims that she is entitled to benefits under section

1132(a)(1)(B) because the term in the Plan that denies long-term

disability benefits to people like her who, though mentally ill,

do not require hospitalization, is void under the ADA or the

Rehabilitation Act.  See Pl.'s Mem. at 3, 6-8.  She argues that
the Plan discriminates between the mentally disabled and the
physically disabled because it places a condition --
hospitalization -- on receipt of long-term benefits for
participants with a mental disability, when no such condition
applies for participants with physical disabilities.  See id. at
7-8 & n.4.  She also raises two claims under section 1140: (1)
that she "was discharged for attempting to exercise her right to
long-term disability benefits;" and (2) "that the terms of the
Plan are invidiously discriminatory."  Pl.'s Mem. at 7.

    Intel and Matrix first argue that Iwata's claims must fail
because nothing in ERISA prohibits a plan from imposing different
conditions for receipt of benefits for mental disabilities as
opposed to physical ones.  Defs.' Reply at 3.  Given that both
parties concede that the Plan's terms do not permit Iwata to
recover benefits, and given that ERISA does not require the plan
to include different terms, Intel and Matrix essentially argue
(1) that Iwata has no right to recover benefits under Section
1132(a)(1)(B), (2) that the terms of the Plan cannot violate
section 1140, and (3) that because Iwata has no relevant rights
under the plan or ERISA, Intel could not have had a
discriminatory motive in firing her.  Intel and Matrix also argue
that "as the Complaint and her Opposition make clear, [Iwata's]

termination was caused by her inability to return to work because of her continuing disability." Defs.' Reply at 4.

That ERISA does not prohibit a plan from treating mental and physical disabilities differently is true as far as it goes. See Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 91 (1983) ("ERISA does not mandate that employers provide any particular benefits, and does not itself proscribe discrimination in the provision of employee benefits."); see also Edes v. Verizon Communications, Inc., 288 F. Supp. 2d 55, 58-59 (D. Mass. 2003) (Saris, J.) (dismissing claim for benefits under plan and claim for discrimination under ERISA where plaintiffs alleged that the employer unlawfully provided unequal levels of benefits); Wilson v. Globe Specialty Prods., Inc., 117 F. Supp. 2d 92, 97-98 (D. Mass. 2000) (Tauro, J.) (dismissing a claim that ERISA prohibited disparate treatment of mental and physical disabilities under a benefit plan and noting that "ERISA does not require that employment plans . . . provide equal benefits for different disabilities").

As 29 U.S.C. § 1144(d) (ERISA § 514(d)) states, however: "Nothing in this subchapter shall be construed to alter, amend, modify, invalidate, impair, or supersede any law of the United States . . . or any rule or regulation issued under any such law." ERISA and federal civil rights laws such as the ADA and the Rehabilitation Act thus coexist peacefully in the United

States Code.  If Iwata establishes that the ADA or the
Rehabilitation Act renders the allegedly discriminatory term in
the Plan unenforceable, then she may be able to invoke the
equitable remedy of striking the offending term in the Plan.  See
Rest. (2d) of Contracts § 178(1) (1981) ("A promise or other term
of an agreement is unenforceable on grounds of public policy if
legislation provides that it is unenforceable or the interest in
its enforcement is clearly outweighed in the circumstances by a
public policy against the enforcement of such terms"); id. § 179
(listing legislation and "the need to protect some aspect of the
public welfare" as bases of such a public policy); id. § 184
(describing the conditions under which a court may enforce the
remainder of an agreement of which only some of the terms are
unenforceable); see also Begelfer v. Najarian, 381 Mass. 177, 189
(1980) (striking a default provision in a promissory note on
public policy grounds, rather than voiding the entire contract).[1]

---

[1] The federal courts have the power to fashion "a federal
common law of rights and obligations under ERISA-regulated
plans." Black & Decker Disability Plan v. Nord, 538 U.S. 822,
831 (2003) (quoting Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41,
56 (1987)) (internal quotation marks omitted); see 29 U.S.C. §
1132(a)(3) (permitting a participant in an ERISA-governed plan to
bring a civil action for "appropriate equitable relief").  At
present, the Court need not determine the proper rule of decision
-- that is, whether the Court should fashion a nationwide rule or
should instead incorporate state law as the rule of decision.
See United States v. Kimbell Foods, Inc., 440 U.S. 715, 727-29
(1979); see also Muldoon v. C.J. Muldoon & Sons, 278 F.3d 31, 32
(1st Cir. 2002) (looking to Massachusetts state law to determine
the appropriate statute of limitations for wrongful termination
claims under 29 U.S.C. § 1140).  Neither party has briefed the
issue, and Massachusetts law does not appear to be dissimilar

If the Plan, read without the offending term, entitles Iwata to benefits, then she should have a claim under 29 U.S.C. § 1132(a)(1)(B) for benefits due, or for other relief. Enforcement of the Plan without the offending term might also be considered "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3), but in either case, Iwata would be stating a claim for relief under ERISA.

Intel and Matrix are on firmer ground with regard to Iwata's claims under section 1140, however. A change in the terms of a plan might trigger liability under section 1140 if the change were discriminatory, "intentionally benefitting, or injuring, certain identified employees or a certain group of employees," Aronson v. Servus Rubber, Div. of Chromalloy, 730 F.2d 12, 16 (1st Cir. 1984), but Iwata has cited no authority to show that the existence of discriminatory terms within a plan creates liability under section 1140. The cases she cites –– Aronson and Choi v. Massachusetts Gen. Physicians Org., Inc., 66 F. Supp. 2d 251, 254 & n.5 (D. Mass. 1999) (Lasker, J.) –– only establish the former proposition, not the latter.

Iwata also cannot establish retaliatory discharge under section 1140, because her Complaint admits that she was unable to return to work. Compl. § 42. To establish that she was

---

from the Restatement provisions on which a federal court would likely rely to fashion a nationwide rule.

terminated in violation of section 1140, she would first need to make out a prima facie case that: "(1) [s]he had the opportunity to attain rights under an ERISA benefit plan; (2) [s]he was qualified for the position at issue; and (3) [s]he was subjected to adverse action under circumstances that give rise to an inference of discrimination." Lehman v. Prudential Ins. Co. of America, 74 F.3d 323, 330 (1st Cir. 1996) (citing Barbour v. Dynamics Research Corp., 63 F.3d 32, 37-38 (1st Cir. 1995)). Should Iwata make out her prima facie case, First Circuit precedent holds that at the second stage, "[t]o dispel the inference of discrimination arising from a prima facie case, [a defendant] must only articulate, it need not prove, a non-discriminatory reason for its [action]." Id. Should Intel succeed at the third stage Iwata must show, according to the First Circuit, that Intel "was motivated by the specific intent of interfering with [her] ERISA benefits." Id. (quoting Barbour, 63 F.3d at 37) (internal quotation marks omitted).

Iwata nowhere alleges that she could have returned to work with treatment, medication, or a "reasonable accommodation," see 42 U.S.C. § 12112(b)(5)(A) (including within the ADA's definition of "discrimination" "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee," subject to an "undue hardship" exception), so her inability to

work means that, by definition, she was no longer qualified for her position, unless she can explain the inconsistency.  Cf. Cleveland v. Policy Management Sys. Corp., 526 U.S. 795, 805-06 (1999) (holding that although application for or receipt of social security disability ("SSDI") benefits did not create a special legal presumption against an ADA suit, the ADA claimant had to provide a sufficient explanation as to why her SSDI status was consistent with an ability to "perform the essential functions" of her job, at least with a reasonable accommodation). Iwata has not done so.  Thus, she cannot make out her prima facie case, and her retaliatory discharge claim must fail.  Because this is so, the Court need not address whether and how the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003), may have undermined First Circuit law regarding the remaining steps of the analysis.[2]

---

[2] In Desert Palace, the Supreme Court effectively held that in the wake of the Civil Rights Act of 1991, discrimination cases under 42 U.S.C. § 2000e-2 have all become mixed motive cases; in other words, once a plaintiff has shown that unlawful discrimination was "a motivating factor" in an adverse employment action, the burden of proof (not merely production) falls on the defendant to show that it would have reached the same decision in the absence of discrimination.  See 539 U.S. at 92-94, 102.  The Supreme Court, though acknowledging that the Act was passed in large part in response to Supreme Court decisions interpreting the Civil Rights Acts of 1866 and 1964, id. at 94, based its analysis entirely on the text of section 2000e-2.  See id. at 98-102.  Given that there is no equivalent language in 42 U.S.C. § 2000e-3 which governs retaliatory discharge, the Supreme Court may well refuse to apply Desert Palace to cases that fall outside of section 2000e-2.  Cf. Raytheon Co. v. Hernandez, 124 S. Ct. 513, 518 (2003) (applying, after Desert Palace was decided, the burden shifting framework of McDonnell Douglas Corp. v. Green,

Intel and Matrix also argue that Iwata failed to exhaust administrative remedies under the Plan. As Iwata correctly argues, however, exhaustion is not required "when resort to the administrative route is futile or the remedy inadequate." Drinkwater v. Metro. Life Ins. Co., 846 F.2d 821, 826 (1st Cir. 1988) (quoting Amato v. Bernard, 618 F.2d 559, 568 (9th Cir. 1980)) (internal quotations omitted); see Terry v. Bayer Corp., 145 F.3d 28, 40 (1st Cir. 1998). The futility exception most obviously applies in cases where the administrative tribunal lacks power to award the relief sought, and Iwata's claim that federal statutes render the terms of the Plan facially invalid is not a claim on which Matrix would have power to grant relief. Thus, Iwata's claim regarding the enforceability of the Plan's restriction on long-term benefits for participants with mental disabilities is properly before this Court.

**D.   The ADA Claim**

**1.   The ADA**

Title I of the ADA[3] reads, in pertinent part:

---

411 U.S. 792 (1973), to an ADA claim, without considering the possibility that Desert Palace might have changed or eliminated the third step of that process). But cf. id. (focusing on the lower court's error in applying the second part of the process). Still, if the Civil Rights Act of 1991 is treated as a broader repudiation of the Supreme Court's earlier jurisprudence, then Desert Palace may apply to retaliation cases. If that is so, then it may also apply to retaliation cases under section 1140.

[3] Iwata has not argued that the Plan terms violate Title III of the ADA, which reads, in pertinent part:

> No covered entity shall discriminate against a
> qualified individual with a disability because of the
> disability of such individual in regard to job
> application procedures, the hiring, advancement, or
> discharge of employees, employee compensation, job
> training, and other terms, conditions, and privileges
> of employment.

42 U.S.C. § 12112(a).  For purposes of that subsection, the term

"discriminate" includes "limiting, segregating, or classifying a

job applicant or employee in a way that adversely affects the

opportunities or status of such applicant or employee because of

the disability of such applicant or employee," either directly or

via a contractual relationship with, inter alia, "an organization

providing fringe benefits to an employee of the covered entity."

Id. § 12112(b)(1)-(2).  The definition also includes "utilizing

---

> No individual shall be discriminated against on the
> basis of disability in the full and equal enjoyment of
> the goods, services, facilities, privileges,
> advantages, or accommodations of any place of public
> accommodation by any person who owns, leases (or leases
> to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).  The First Circuit has acknowledged the
possibility that the public accommodations provisions of Title
III might apply to health benefit plans, at least in some
circumstances.  Carparts Distrib. Ctr., Inc. v. Automotive
Wholesaler's Assoc. of New England, Inc., 37 F.3d 12, 19-20 (1st
Cir. 1994).  That logic may extend to welfare benefit plans as
well.  Other circuits have criticized the First Circuit's
suggestion.  See Weyer v. Twentieth Century Fox Film Corp., 198
F.3d 1104, 1113 & n.48 (9th Cir. 2000) (noting "that insurance
companies do not even meet the expansive (and questionable) First
Circuit approach"); Ford v. Schering-Plough Corp., 145 F.3d 601,
614 (3d Cir. 1998) (noting that the court "part[s] company with
the First Circuit" regarding the definition of public
accommodation); Parker v. Metro. Life Ins. Co., 121 F.3d 1006,
1013-14 (6th Cir. 1997) (noting "disagree[ment] with the First
Circuit's decision in Carparts").

standards, criteria, or methods of administration . . . that have the effect of discrimination on the basis of disability." Id. § 12112(b)(3).

Under regulations issued to effect the ADA's provisions, "[i]t is unlawful for [an entity covered by the ADA] to discriminate on the basis of disability against a qualified individual with a disability in regard to . . .[f]ringe benefits available by virtue of employment, whether or not administered by the covered entity." 29 C.F.R. § 1630.4(f). At the same time, the ADA contains a "safe harbor" provision:

(c) Insurance

Subchapters I through III of this chapter and title IV of this Act shall not be construed to prohibit or restrict--

> (1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

> (2) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law; or

> (3) a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that is not subject to State laws that regulate insurance.

16

Paragraphs (1), (2), and (3) shall not be used as a subterfuge to evade the purposes of subchapter[s] I and III of this chapter.

42 U.S.C. § 12201(c) (footnote omitted).[4]

> ### 2. Iwata is a "Qualified Individual with a Disability"

Intel and Matrix argue that Iwata cannot prevail under the ADA, because she is not a "qualified individual with a disability." Under 42 U.S.C. § 12112, "qualified individual with a disability" is defined as "an individual with a disability who, with or without a reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). According to Intel and Matrix, because Iwata fails to allege that she could have performed the essential functions of the job, and because her entire action is premised on the assertion that, barring the hospitalization condition, she is eligible for long-term disability benefits, she cannot simultaneously argue that she falls within the terms of the ADA. Defs.' Mem. at 10. Iwata disagrees. None of the parties cites any case law that is on point.

Intel and Matrix rely primarily on Cleveland v. Policy Management Sys. Corp., 526 U.S. 795 (1999). See Defs.' Mem. at

---

[4] The footnote in the last paragraph of this provision notes that the original statute makes "subchapter" singular, even though it was likely meant to be plural. See 42 U.S.C. § 12201(c) n.1.

10.  In <u>Cleveland</u>, a recipient of social security disability insurance ("SSDI") payments brought an action against her former employer, alleging that her employment was terminated in violation of the ADA.  526 U.S. at 798-99.  The Social Security Administration will only provide SSDI benefits to an individual with a disability so severe that she is "unable to do [her] previous work" and "cannot . . . engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).  The Supreme Court held that although application for or receipt of SSDI benefits did not create a special legal presumption against an ADA suit, the ADA claimant had to provide a sufficient explanation as to why her SSDI status was consistent with an ability to "perform the essential functions" of her job, at least with a reasonable accommodation. <u>Cleveland</u>, 526 U.S. at 805-06.

The Supreme Court's pronouncements here must be understood in context, however.  In <u>Cleveland</u>, the claim was that the employer fired the plaintiff, even though she could "perform the essential functions" of her job with a reasonable accommodation. That is the most common form of claim under the ADA.  Here, however, the claim is that a policy that provides benefits only once an employee can no longer work contains terms that discriminate under the ADA.  <u>Cleveland</u> states the rule for run-of-the-mill cases where an aggrieved individual is either seeking

18

to be hired, promoted, or reinstated; it simply does not address claims like Iwata's.

Intel and Matrix's reliance on Sullivan v. Raytheon Co., 262 F.3d 41 (1st Cir. 2001), is also misplaced.  First, that case only addresses disability-based discrimination under Mass. Gen. Laws ch. 151B, not the ADA.  See Sullivan, 262 F.3d at 47. Moreover, similarly to Cleveland, Sullivan involved an employer's refusal to reinstate the plaintiff, despite his alleged ability to perform his job duties.  Id. at 45-46.

The Court's own research reveals that several circuits have taken Intel and Matrix's approach, however, holding that in order to prevail on a claim under Title I of the ADA, even one involving fringe benefits, a plaintiff must be able to perform the essential functions of her job, with or without a reasonable accommodation.  See Weyer v. Twentieth Century Fox Film Corp., 198 F.3d 1104, 1108 (9th Cir. 2000)(noting the burden of proof rests with the ADA plaintiff); Parker v. Metro. Life Ins. Co., 99 F.3d 181, 186-87 (6th Cir. 1999), rev'd on other grounds, 121 F.3d 1006 (6th Cir. 1997) (en banc); EEOC v. CNA Ins. Cos., 96 F.3d 1039, 1043-44 (7th Cir. 1996); Beauford v. Father Flanagan's Boys' Home, 831 F.2d 768, 771 (8th Cir. 1987) (holding as much under the Rehabilitation Act).

As the Second and Third Circuits have held, however, because the ADA expressly extends to provision of fringe benefits, which

19

typically wold be received by people who are too disabled to
continue working, the temporal scope of the term "qualified
individual with a disability" must be broad.  See Ford v.
Schering-Plough Corp., 145 F.3d 601, 605-07 (3d Cir. 1998)
(citing Robinson v. Shell Oil Co., 519 U.S. 337, 341-46 (1997));
Castellano v. City of New York, 142 F.3d 58, 67 (2d Cir. 1998)
(same).  In other words, it would frustrate the purpose of the
ADA to deny Iwata statutory standing to bring this claim; Intel
and Matrix' approach would hold that no totally disabled person
could ever challenge discriminatory distribution of fringe
benefits, even though the ADA prohibits such discrimination.

The Supreme Court faced a similar issue in Robinson, a case
that involved section 704(a) of Title VII of the Civil Rights Act
of 1964, which makes it illegal "for an employer to discriminate
against any of his employees or applicants for employment" who
have invoked Title VII's protections or have helped others to do
so.  42 U.S.C. § 2000e-3(a).  The Supreme Court held that the
term "employee" includes former employees.  Id. at 339.  It held
the statute to be ambiguous on this point, particularly because
the term's use in other parts of Title VII sometimes indicated
only "current employees" and sometimes indicated "current and
former employees."  See id. at 340-46.  It found persuasive,
however, the argument that the narrower interpretation of

20

"employee" "would effectively vitiate much of the protection afforded by § 704(a)."  Id. at 345.

A similar concern about vitiating the protection afforded by Title I of the ADA applies here, and this Court joins the Second and Third Circuits in holding that "qualified individual with a disability" must be interpreted to give effect to the rights that the ADA has created.  It seems unlikely that Congress intended to create a bait-and-switch, where an individual is only covered by the statute until the moment when she actually needs its protection.  The more reasonable interpretation of the statute is that a former employee who is denied access to fringe benefits due to disability-based discrimination can bring suit to challenge such discrimination.

### 3.    The ADA Prohibits Discrimination Between the Mentally Disabled and the Physically Disabled

Intel and Matrix also argue that the ADA does not require welfare benefit plans to provide equal levels of benefits for mentally and physically disabled participants.  A number of courts have held that plans that treat mentally ill and physically disabled plan participants or beneficiaries differently are permissible under either the Rehabilitation Act or the ADA.  See Weyer, 198 F.3d at 1116-17 (holding that conditions on long-term disability benefits for mental illnesses did not constitute discrimination under the ADA, as conditions were equally applicable to all employees); EEOC v. Staten Is.

Sav. Bank, 207 F.3d 144, 148 (2d Cir. 2000) (affirming dismissal
under Rule 12(b)(6) of ADA claim because the statute did not
require an employer to provide a particular level of benefits);
Kimber v. Thiokol Corp., 196 F.3d 1092, 1102 (10th Cir. 1999)
(same); Lewis v. Kmart Corp., 180 F.3d 166, 172 (4th Cir. 1999)
(same); Ford, 145 F.3d at 608 (same);[5] Parker v. Metro. Life Ins.
Co., 121 F.3d 1006, 1015-19 (6th Cir. 1997) (en banc) (stating
"that Congress did not believe the necessity for parity between
mental and physical disabilities in long-term disability plans
was sufficiently compelling to include them within the purview of
the Act"); CNA Ins. Co., 96 F.3d at 1044-45 (affirming dismissal
under Rule 12(b)(6)); Krauel v. Iowa Methodist Med. Ctr., 95 F.3d
674, 678 (8th Cir. 1996) (affirming the decision that the plan
was "not a disability-based distinction in violation of the
ADA"); Modderno v. King, 82 F.3d 1059, 1061-62 (D.C. Cir. 1996)
(citing Alexander v. Choate, 469 U.S. 287, 304 (1985)) (affirming
dismissal of claim under the Rehabilitation Act that plan
discriminated against persons with mental disabilities); Wilson,
117 F. Supp. 2d at 97-98 (dismissing claims since access to the
disability plan was not denied).

---

[5] See also Ford, 145 F.3d at 608 ("So long as every employee
is offered the same plan regardless of that employee's
contemporary of future disability status, then no discrimination
has occurred even if the plan offers different coverage for
various disabilities.").

Intel and Matrix rely also on dicta from <u>Traynor</u> v. <u>Turnage</u>, 485 U.S. 535 (1988), where the Supreme Court stated that "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped persons also be extended to all other categories of handicapped persons." <u>Id.</u> at 549. The Rehabilitation Act in many ways resembles the ADA, and ADA case law and Rehabilitation Act case law in fact draw heavily on one another, <u>see, e.g.</u>, <u>Calero-Cerezo</u> v. <u>United States Dep't of Justice</u>, 355 F.3d 6, 19 (1st Cir. 2004) ("Although . . . the ADA does not apply here, the case law construing the ADA generally pertains equally to claims under the Rehabilitation Act."); <u>see also</u> 29 U.S.C. § 794(d) ("The standards used to determine whether [Title V of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under [Title V] shall be the standards applied under title I of the Americans with Disabilities Act of 1990 . . . and the provisions of sections 501 through 504, and 510, of the [ADA,] . . . as such sections relate to employment."); 42 U.S.C. § 12201(a) (noting that except as otherwise provided, "nothing in [the ADA] shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 . . . or the regulations issued by Federal agencies pursuant to such title"). Thus, although the First Circuit has not addressed the issue, the Second, Third, Fourth, Sixth, Seventh, Eighth, Ninth, Tenth, and

D.C. Circuits have all held that no relief can be granted on claims like Iwata's.

The strongest argument any court has yet made to the contrary is in Johnson v. K Mart Corp., 273 F.3d 1035 (11th Cir. 2001), an opinion that has since been vacated pending rehearing en banc.[6]  The parties dispute whether this constitutes authority on which this Court can rely, but the logic of the opinion is worth considering, regardless of the opinion's precedential value in the Eleventh Circuit.

Johnson held that a long-term disability plan's provision of lesser benefits for the mentally disabled than for the physically disabled constituted discrimination under the ADA.  The court began by noting that remedial statutes should be given broad construction.  273 F.3d at 1049.  (That principle applies in this Circuit as well.  Peyton v. Rowe, 391 U.S. 54, 65 (1968).)  The court then noted that virtually all of the courts that had upheld differentiation between physical and mental disabilities in distributing benefits under a plan had done so with an understanding that the "discrimination" at which the ADA aims is discrimination between the disabled and the non-disabled, not among different classes of the disabled.  Id. at 1050, 1054 & n.16.

_____

[6] The rehearing is on hold indefinitely because one of the parties is in bankruptcy. See Johnson v. K Mart Corp., 281 F.3d 1368 (11th Cir. 2002).

24

The <u>Johnson</u> court explained that a Supreme Court decision
that postdated virtually all of those decisions had established a
broader conception of discrimination under the ADA, one that
extended to discrimination amongst classes of the disabled.
<u>Johnson</u>, 273 F.3d at 1051-53.  In <u>Olmstead</u> v. <u>L.C.</u>, 527 U.S. 581
(1999), the Supreme Court held that under Title II of the ADA,
where mentally ill individuals were qualified for community-based
treatment and did not object to such treatment, the state could
not confine them in a segregated environment, although the state
could take available resources into account in determining
whether they were entitled to immediate community placement.
<u>Id.</u> at 597.  In so doing, the Supreme Court embraced the above-
described broader conception of "discrimination" under the ADA,
which reaches discrimination amongst classes of the disabled.
<u>See</u> <u>id.</u> at 598-603.

The <u>Johnson</u> court reasoned that, although <u>Olmstead</u> dealt
with Title II of the ADA, its conception of discrimination
applied to claims under Title I as well.  <u>Johnson</u>, 273 F.3d at
1053 (explaining that the majority in <u>Olmstead</u> "substantially
import[ed] the definition of Title I into Title II").  The court
noted that even the <u>Olmstead</u> dissenters, who accused the majority
of failing to interpret Title II in light of the narrower
traditional concept of discrimination, acknowledged that Title I
had specifically altered the traditional concept for claims under

25

that Title in precisely way the majority held that Title II had.
See id. (citing Olmstead, 527 U.S. at 616, 622-23 (Thomas, J.,
dissenting, joined by Chief Justice Rehnquist and Justice
Scalia).

The Johnson court then looked to the legislative history of
the ADA, and found nothing that would contradict its
interpretation.  Id. at 1054-56.  It also examined the role of
the safe harbor provision, see id. at 1056-60, an issue that this
Court need not address because Intel and Matrix have not raised
it, and because discovery may be necessary to answer the relevant
questions.

This Court agrees with the Johnson court's analysis of
Olmstead.  Title I of the ADA prohibits discrimination amongst
classes of the disabled.

### 4.   Welfare Benefit Plans Cannot Discriminate Amongst Classes of the Disabled

Although Olmstead stands for the proposition that Title I of
the ADA, like Title II, forbids discrimination between mentally
disabled and physically disabled people, the question remains
whether the differentiation in the Plan constitutes such
discrimination.  As mentioned above, the Supreme Court has stated
that "[t]here is nothing in the Rehabilitation Act that requires
that any benefit extended to one category of handicapped persons
also be extended to all other categories of handicapped persons,"
Traynor, 485 U.S. at 549.

26

The first thing to note about this statement is that it is dicta. In Traynor, the Veterans' Administration had refused to grant two recovered alcoholics an extension of time to use their veterans' educational benefits. 485 U.S. at 537. The Supreme Court held that the 1978 Rehabilitation Act amendments did not forbid this refusal, because it did not impliedly repeal 1977 legislation that, while requiring such extensions for individuals who delayed because of a physical or mental disability, did not allow such extensions where the disability resulted from the veteran's own "willful misconduct." Id. at 545-48. The statement on which Intel and Matrix rely is used to bolster the point, but it is far from necessary to the decision.

Second, Traynor was decided some time before Olmstead. If this Court's interpretation of Olmstead is correct, then that decision has abrogated Traynor. Elsewhere in Traynor, the Supreme Court noted that "the central purpose of § 504" of the Rehabilitation Act "is to assure that handicapped individuals receive 'evenhanded treatment' in relation to nonhandicapped individuals." Id. at 548 (quoting Alexander v. Choate, 469 U.S. at 304). Under Olmstead, however, the ADA –– and by extension the Rehabilitation Act –– aim not only at "evenhanded treatment" between the disabled and the nondisabled, but between different classes of the disabled.

Intel and Matrix make a number of further arguments.  First, they argue that the legislative history of the ADA demonstrates that Congress did not intend for the statute to forbid plan terms like the one in issue here.  See Defs.' Supp. Mem. at 4-6.  They next argue that the Equal Employment Opportunity Commission's interpretation of the ADA is consistent with this legislative history, id. at 6-7, as is legislative activity subsequent to passage of the ADA, id. at 7-15.  Thus, they contend, Congress should address the issues surrounding parity for mental health benefits, not the courts.  Id. at 15-18.

### a.   The ADA's Legislative History

Looking first to the ADA's legislative history, it is clear that Congress did not intend to prohibit differential coverage based on type of disability in health insurance plans, but Intel and Matrix have failed to cite -- and the Court has been unable to find -- evidence of such intent with respect to disability benefit plans.  For example, the Senate Committee Report and the Two House Committee Reports on the ADA state that "it is permissible [under the ADA] for an employer to offer insurance policies that limit coverage for certain procedures or treatments."  S. Rep. No. 101-116, at 29; H.R. Rep. No. 101-485 (III) (1990); H.R. Rep. No. 101-485 (II) (1990).  One such permissible limitation would be "only a specified amount per year for mental health coverage."  S. Rep. No. 101-116, at 29.

28

It is problematic to draw inferences regarding the ADA's application to welfare benefit plans based on legislative history regarding the ADA's application to health insurance plans, particularly in the absence of legislative consideration of the former.  There are important differences between the two types of plans.  With regard to employees who become disabled, the basic element of actuarial risk in a disability benefit plan is the likelihood that an employee will become disabled.  There is virtually no volatility in the amount the plan will have to pay out to individual employees, because the amount of benefits will generally be fixed within a limited range.  This is because benefits under such plans serve as a substitute for wage income.  By contrast, the actuarial risk for health insurance plans relates not only to the likelihood of disability, but also to the cost of treating that disability.  Although the volatility on the former element is no greater than it would be under a welfare benefits plan, the volatility of the latter element is likely substantial.

Congress apparently thought that if health insurance plans had to provide the same coverage for all illnesses, health insurance might become prohibitively expensive.  There might be plenty of legitimate actuarial reasons to differentiate between mental disabilities and physical disabilities in a health insurance plan that have nothing to do with animus toward or

stereotypes regarding individuals with mental illness.  For example, it may be that mental illness is much more likely to require treatment with prescription drugs, and a health insurance plan might reasonably try to keep its costs down by limiting exposure to skyrocketing drug prices.  The judgments in this arena likely involve complex calculations based on specialized knowledge of health care markets, likelihood of various illnesses and disabilities, and other factors.  Congress might well have wanted sharply to limit the ability of courts to second-guess such judgments, particularly because litigation of such matters would invariably prove costly, and would drive up the very costs Congress is trying to keep down.

In welfare benefit plans, however, it is much more difficult to find actuarial reasons to treat mentally and physically disabled participants differently.  The costs of income replacement do not vary based on whether an individual's inability to work results from mental or physical disability.  It is considerably more likely that differential treatment in such a context results from beliefs that mental illness is less "real" or debilitating than physical injury, or that individuals who claim to have mental disabilities are more apt to be "faking it."

It is also worth noting there is not necessarily a nexus between disability and the distinctions permitted in health insurance plans.  Though the Court has no evidence before it

30

regarding typical terms in health insurance plans, it seems
likely that limitations on treatment or overall benefits are tied
to health conditions, not to disability.  A limitation on
benefits for mental illness generally or for particular illnesses
or treatments will sometimes impact individuals with mental
illnesses, but it will often fall on people who, though mentally
ill, are not disabled.  The fit between the potentially
discriminatory terms and the categories with which the ADA is
concerned is thus not nearly as tight as is the distinction
between mental and physical disability in welfare benefit plans
like the one in this case.  Indeed, the EEOC has stated in an
Enforcement Guidance that:

> health-related insurance distinctions that are based on
> a disability may violate the ADA.  A term or provision
> is "disability-based" if it singles out a particular
> disability (e.g., deafness, AIDS, schizophrenia), a
> discrete group of disabilities (e.g., cancers, muscular
> dystrophies, kidney diseases), or disability in general
> (e.g., non-coverage of all conditions that
> substantially limit a major life activity).

EEOC, Interim Enforcement Guidance on the Application of the
Americans with Disabilities Act of 1990 to Disability-based
Distinctions in Employer Provided Health Insurance (last modified
June 8, 1993) ("Interim Enforcement Guidance"), available at
http://www.eeoc.gov/policy/docs/health.html.  Thus, as the fit
between a distinction and a category of disability becomes close,
the likelihood that invidious discrimination is involved becomes

greater, and is more apt to bring the distinction within the ADA's ambit.

Thus, Congress's failure to discuss the ADA's application to welfare benefit plans may have resulted from a recognition that such plans are fundamentally different from health insurance plans, rather than substantially similar. At best, the legislative history and silence discussed points in neither direction.

### b.    The EEOC's Interpretation of the ADA

With respect to the EEOC's interpretation of the ADA, again Intel and Matrix have only pointed to materials dealing with health care plans. The Appendix to 29 C.F.R. pt. 1630, entitled "Interpretive Guidance on Title I of the Americans With Disabilities Act," notes with respect to 29 C.F.R. § 1630.5 that "it would be permissible for an employer to offer an insurance policy that limits coverage for certain procedures or treatments," so long as the limitations apply equally to all participants, irrespective of disability. Moreover, the EEOC has stated:

> [A] feature of some employer provided health insurance plans is a distinction between the benefits provided for the treatment of physical conditions on the one hand, and the benefits provided for the treatment of "mental/nervous" conditions on the other. Typically, a lower level of benefits is provided for the treatment of mental/nervous conditions than is provided for the treatment of physical conditions. Similarly, some health insurance plans provide fewer benefits for "eye care" than for other physical conditions. Such broad

distinctions, which apply to the treatment of a
multitude of dissimilar conditions and which constrain
individuals both with and without disabilities, are not
distinctions based on disability.  Consequently,
although such distinctions may have a greater impact on
certain individuals with disabilities, they do not
intentionally discriminate on the basis of disability
and do not violate the ADA.

Interim Enforcement Guidance, supra (footnotes omitted).

Although Intel and Matrix have not briefed the issue, the

Court assumes for the sake of argument that these regulatory

materials have legal force and are entitled to deference under

Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467

U.S. 837, 844 (1984) (indicating "the [long-standing] principle

of deference to administrative interpretations").  As the Court

has already suggested, these materials shed no more light on the

issues in this case than does the ADA's legislative history

because there are fundamental differences between health

insurance plans and disability benefit plans.

In fact, the very regulatory materials that Intel and Matrix

cite support, if anything, Iwata's view.  The Court has already

discussed the EEOC's view that "health-related insurance

distinctions that are based on disability may violate the ADA."

Interim Enforcement Guidance, supra.  The Appendix to 29 C.F.R.

pt. 1630 provides further guidance.  29 C.F.R. § 1630.16(f)

basically restates the ADA's safe harbor provision.  The section

of the Appendix that addresses section 16030.16(f) explains that

"[t]he purpose of this provision is to permit the development and

administration of benefit plans in accordance with accepted principles of risk assessment." 29 C.F.R. pt. 1630, App. Importantly, "Part 1630 requires that decisions not based on risk classification be made in conformity with non-discrimination requirements." Id. Thus, if anything, the EEOC's interpretation supports Iwata's contention that the ADA only permits disability-based distinctions in welfare benefit plans if they are grounded in actuarial principles.

   c.   Congressional Action After Passage of the ADA

   Intel and Matrix next point to several post-ADA statutes that mandate particular terms and conditions in the provision of employee health insurance. The Newborns' and Mothers' Protection Act of 1996, codified at 26 U.S.C. § 9811, amended ERISA to prohibit group health plans from imposing certain coverage limitations on childbirth-related hospital stays. See 29 U.S.C. § 1185. Another 1996 statute, the Health Insurance Portability and Accountability Act, Pub. L. No. 104-191, 110 Stat. 1936 (1986), amended ERISA to impose limitations on certain exclusions for pre-existing conditions. See 29 U.S.C. § 1181. In 1998, Congress passed the Women's Health and Cancer Rights Act, Pub. L. No. 105-277, 112 Stat. 2681 (1998), which again amended ERISA to require group health plans to provide certain medical and surgical benefits related to mastectomies. See 29 U.S.C. § 1185b.

The first thing to note is that none of these statutes appears to have a particularly close nexus with disability, much less with distinctions between mental and physical disabilities. Second, they all deal with health care plans, not with disability benefit plans.  If anything, the absence of Congressional attention to disability benefit plans during a period when it frequently legislated on health care plan issues is no less likely to result from a belief that the ADA already addresses any lack of parity between mental and physical disabilities in such plans than it is to result from a lack of congressional concern with such disparities.

Intel and Matrix also discuss the Mental Health Parity Act of 1996 ("MHPA"), see Pub. L. No. 104-204, 110 Stat. 2944 (1996), and the thus-far unsuccessful attempts of advocates to assemble majorities in both houses of Congress to require full parity between mental illness and physical illness in health care plans. MHPA amended ERISA to prohibit group health plans from having different annual or aggregate lifetime limits for treatments as between mental and physical diseases or injuries.  See 29 U.S.C. § 1185a.  As passed, MHPA was less ambitious than the "Parity for Mental Health Services" amendment that Senators Domenici and Wellstone had offered to what ultimately was enacted as HIPAA. See Domenici Amendment No. 3681 to S. 1028, 104th Cong. (1996), 142 Cong. Rec. S3670 (Apr. 18, 1996); 142 Cong. Rec. S9926-27

35

(Sept. 5, 1996) (statement of Sen. Domenici).  That amendment would have required full parity between mental and physical illnesses in health coverage.  See 142 Cong. Rec. S3589 (Apr. 18, 1996) (statement of Sen. Wellstone).  Though the amendment was adopted by the Senate, it was eliminated in the Senate and House conference.  See H.R. Conf. Rep. No. 104-736 (1996).

Senator Domenici and the late Senator Wellstone continued their efforts to achieve parity for mental health coverage in health care plans by advancing a bill entitled the Mental Health Equitable Treatment Act of 2001 (S. 543).  The bill would have amended ERISA to add the following:

> IN GENERAL - In the case of a group health plan (or health insurance coverage offered in connection with such a plan) that provides both medical and surgical benefits and mental health benefits, such plan or coverage shall not impose any treatment limitations or financial requirements with respect to the coverage of benefits for mental illness unless comparable treatment limitations or financial requirements are imposed on medical and surgical benefits.

S. Rep. No. 107-61, at 22 (2001).  The bill has yet to be enacted into law, apparently due to concerns about the cost to the private sector.  See id. at 9-11, 19.  A similar bill, entitled the Senator Paul Wellstone Mental Health Equitable Treatment Act of 2003, see S. 1832, 108th Cong. (2003), 149 Cong. Rec. S14176-03 (Nov. 6, 2003), is apparently currently "stuck" in committee because of concerns about driving up health coverage costs.  150 Cong. Rec. S5731 (May 19, 2004) (statement of Sen. Daschle).

Whatever weight the actions of future Congresses should have in interpreting a law passed by an earlier Congress, here again, the evidence cuts in two directions.  Congress's failure to introduce bills requiring increasing parity between mental and physical disabilities in disability benefit plans could suggest that such disparities do not concern Congress, or it could suggest that Congress believes that such disparities are already illegal under the ADA.  It is perhaps telling, however, that with so much solicitude for the mentally ill in the Senate over the last decade, Intel and Matrix were unable to point to a single bill regarding mental disability parity in welfare benefit plans.

> **d.    Interaction of the Purposes of the ADA and ERISA**

In the absence of definitive guidance from case law, from legislative history, from executive branch interpretations, or from congressional action, the Court is left with the language of the ADA and ERISA, which the Court must interpret in light of the purpose of the two statutes, and with regard to the problems they sought to address.  In passing the ADA, Congress noted that "some 43,000,000 Americans have one or more physical or mental disabilities, and [that] this number is increasing as the population as a whole is growing older."  42 U.S.C. § 12101(a)(1).  Congress also recognized that "historically, society has tended to isolate and segregate individuals with disabilities, and [that] despite some improvements, such forms of

37

discrimination against individuals with disabilities continued to be a serious and pervasive social problem." Id. § 12101(a)(2). Moreover, "census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally." Id. § 12101(a)(6). According to Congress, "the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." Id. § 12101(a)(9).

The purposes of the ADA are:

(1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities;

(2) to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities;

(3) to ensure that the Federal Government plays a central role in enforcing the standards established in this chapter on behalf of individuals with disabilities; and

(4) to invoke the sweep of congressional authority . . . in order to address the major areas of discrimination faced day-to-day by people with disabilities.

Id. § 12101(b).

38

In declaring findings and statutory purpose with respect to
ERISA, Congress stated "that it is therefore desirable in the
interests of employees and their beneficiaries, for the
protection of the revenue of the United States, and to provide
for the free flow of commerce, that minimum standards be provided
assuring the equitable character of [employee benefit] plans and
their financial soundness." 29 U.S.C. § 1001(a). Congress has
made a choice primarily to rely on the private sector to ensure
that disability does not lead to poverty, and ERISA is the means
by which it regulates this private welfare system.

The purposes of the two statutes interact in important ways.
With the ADA, Congress took decisive action to address, among
other things, the "dependency" and "inferior" economic status to
which "the continuing existence of unfair and unnecessary
discrimination and prejudice" relegated individuals with
disabilities in our society. See 42 U.S.C. § 12101(a)-(b).
Congress thus sought to integrate disabled people into the
economic and social mainstream. When an individual becomes
totally disabled on the job, the means by which he typically
avoids poverty and dependency is through an ERISA-governed
benefits plan. If anything, then, the ADA's prohibition against
discrimination most obviously applies in cases where differential
treatment of a class of disabled people would lead to precisely
the kind of economic marginalization that Congress sought to

39

combat with the ADA.  Congress obviously gave private actors considerable leeway in designing welfare benefits plans, but it is important to remember the public purpose that those plans serve.

Plans like the one in this case arguably do not discriminate between the mentally disabled and the physically disabled, because they apply equally to all employees -- they just provide more protection against some kinds of risks than others.  At the same time, Intel and Matrix have failed to show that the ADA permits a disability benefits plan to make disability-based distinctions, at least without any actuarial justification. Moreover, there appears to be a widespread practice of limiting disability benefits for mental illness, possibly based on assumptions that mental illness is "less real" than physical disability, or that recovery therefrom is more a matter of will than in the case of physical disability.  Assuming, then, as the Court must at the motion to dismiss stage, that the Plan's distinction between mental and physical disabilities is motivated by stereotypes about mental disability, rather than by actuarial considerations, Iwata has stated a claim under the ADA.

### 5.  The Safe Harbor Provision

Intel and Matrix have not provided any argument or briefing on the significance of the ADA's safe harbor provision.  Iwata has addressed this provision, see Pl.'s Supp. Mem. at 6-8, but

the burden was on Intel and Matrix to argue for dismissal, so for that reason the Court need not address it at this point. Proper interpretation of this provision is a potentially difficult question that would benefit from briefing on both sides.

### 6. Intel and Matrix's Relative Liability Under the ADA and ERISA

Iwata has also provided argument as to both Intel and Matrix's liability under the ADA and ERISA. See Pl.'s Supp. Mem. at 10-13. Neither defendant has argued that the ADA or ERISA applies to one but not the other of them, so the Court need not address this matter at present.

### E. The Rehabilitation Act Claim

Under section 504(a) of the Rehabilitation Act, 29 U.S.C. § 794(a):

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . .

ADA case law and Rehabilitation Act case law draw heavily on one another, see, e.g., Calero-Cerezo, 355 F.3d at 19; see also 29 U.S.C. § 794(d); 42 U.S.C. § 12201(a). The Court's analysis with respect to the ADA thus applies to Iwata's Rehabilitation Act claim as well.

Although the substantive obligations under the ADA and the Rehabilitation Act are similar, liability under the latter

requires that the defendant be a "recipient" of "federal financial assistance."  Iwata alleges no such assistance in her Complaint, but notes in her memorandum that the Plan is entitled to reduce benefits paid out to a plan participant dollar-for-dollar by any amounts the participant receives from Social Security.  Pl.'s Mem. at 10.  She argues that "[t]he plan is thus directly subsidized by the Social Security system, squarely meeting the requirement of federal funding."  Id.  Intel and Matrix urge that Iwata has cited no case law to support this argument, but they likewise cite no case law to refute it.  See Defs.' Reply at 5.

The relevant regulation reads, in pertinent part:

(e) Federal financial assistance means any grant, loan, or contract (other than a procurement contract or a contract of insurance or guaranty), or any other arrangement by which the agency provides or otherwise makes available assistance in the form of:

(1) Funds;

(2) Services of Federal personnel; or

(3) Real and personal property or any interest in or use of such property, including;

(i) Transfers or leases of such property for less than fair market value or for reduced consideration; and

(ii) Proceeds from a subsequent transfer or lease of such property if the Federal share of its fair market value is not returned to the Federal government.

42

28 C.F.R. § 41.3(e).  Neither party has challenged the regulation's validity.

Although the Rehabilitation Act applies to those who "receive" federal financial assistance, it does not apply to those who merely "benefit" economically from disbursement of federal funds.  See United States Dep't of Trans. v. Paralyzed Veterans of America, 477 U.S. 597, 605-07 (1986).  "By limiting coverage to recipients, Congress imposes the obligations of § 504 upon those who are in a position to accept or reject those obligations as part of the decision whether or not to 'receive' federal funds."  See Paralyzed Veterans, 477 U.S. at 607.  The question, then, is to determine precisely who is Congress's intended recipient under a particular arrangement.

There are two relevant disbursements in this context: payments by the Social Security Administration to individuals who qualify for social security benefits, and Congress's conscious decision to permit integration of ERISA plans with benefits available under the Social Security Act, see Alessi v. Raybestos-Manhattan, Inc., 451 U.S. 504, 514-16 (1981).  Iwata's argument, then, would be that the combined effect of paying social security benefits and permitting an ERISA plan to offset such benefits against benefits otherwise due under the plan is to make the plan a "recipient" of "federal financial assistance."  Although this is a somewhat indirect transfer, the Supreme Court has recognized

43

that "federal financial assistance could be received indirectly,"
as long as the party in question was Congress's intended
recipient and was "in a position to accept or reject those
obligations as part of the decision whether or not to 'receive'
federal funds." Paralyzed Veterans, 477 U.S. at 605-07.

Here, although the exact contractual relationship among the
various parties is unclear, the individuals or entities who
agreed to the language in the Plan were in a position to decide
whether the benefit of being able to offset social security
benefits was worth the burden of complying with the
Rehabilitation Act. Although the federal government transfers
social security benefits to the individual covered under the
Plan, and not to the Plan itself, the net result of that action
and the integration provisions is a transfer to the Plan. ERISA
plans with integration provisions were certainly the intended
"recipients" of social security funds under this regime, much as
colleges are the intended "recipients" of federal student aid.
See Grove City College v. Bell, 465 U.S. 555, 563-65 (1984)
(treating a college as the "recipient" of federal aid under
section 901(a) of Title IX of the Education Amendments of 1972,
20 U.S.C. §§ 1681(a), even though students actually received the
federal aid);[7] see also Paralyzed Veterans, 477 U.S. at 607 ("It

_____

[7] Some elements of the Grove City decision that are not
relevant here have been overruled by statute. See Civil Rights
Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28
(1988); Leake v. Long Island Jewish Med. Ctr., 695 F. Supp. 1414,

44

was this unusual disbursement pattern of money from the
Government through an intermediary (the students) to the intended
recipient that caused us to recognize [in Grove City] that
federal financial assistance could be received indirectly.").

Thus, Iwata has stated a claim under the Rehabilitation Act.

**F.    State Law Claim**

Iwata's state law claim, whether characterized as a
discrimination claim under Article 114 of the Massachusetts
Constitution or Mass. Gen. Laws ch. 151B, is preempted by ERISA.
There can be little doubt that chapter 151B falls within the
ambit of ERISA preemption.  See 29 U.S.C. § 1144; McMahon v.
Digital Equip. Corp., 162 F.3d 28, 36, 38 (1st Cir. 1998).  Iwata
characterized her claim as a state constitutional claim, but
under Tate v. Department of Mental Health, 419 Mass. 356 (1995),
"if a violation of art. 114 rights can be redressed within the
ambit of an existing statute, . . . [a] claim under G.L. c. 151B
provides adequate relief to redress handicap discrimination by an
employer and, therefore, precludes a right of action arising
directly under the Massachusetts Constitution."  Id. at 365.
Ordinarily, then, her claim must be maintained to be under
chapter 151B, not article 114, and chapter 151B is preempted.

Iwata might argue that, because the statute is preempted, it
does not "provide adequate relief," so she should be permitted to

---

1415-16 (E.D.N.Y. 1988).

bring a claim under article 114.  She suggests that it is not
necessarily true that federal statutes can "automatically"
preempt state constitutions, Pl.'s Mem. at 16, but she cites no
authority for the proposition, nor does she provide any argument
for it.  It is difficult to imagine why the Supremacy Clause,
U.S. const. art. VI, would apply to state statutes but not to
state constitutions.  "The relative importance to the State of
its own law is not material when there is a conflict with a valid
federal law, for the Framers of our Constitution provided that
the federal law must prevail."  Free v. Bland, 369 U.S. 663, 666
(1962).  The Supremacy Clause's concern is with states
frustrating federal law in an area where the federal government
is entitled to legislate, and that concern is the same whether a
state's citizens create the law through majoritarian processes or
through supermajoritarian processes.  Thus, Article 114 is
preempted as well.

    As Iwata correctly argues, however, Massachusetts state law
is only preempted to the extent that it is not congruent with
federal civil rights law.  See Shaw, 463 U.S. at 102-06 (holding
as much under section 708 of Title VII of the Civil Rights Act of
1964); see also 42 U.S.C. § 12117 (integrating the ADA into the
Title VII enforcement scheme); id. § 12201(b) (codifying an ADA
provision similar to section 708 of Title VII); Tompkins v.
United Healthcare of New England, Inc., 203 F.3d 90, 97 (1st Cir.

2000) ("[I]f [a plaintiff's] state statutory claims targeted conduct unlawful under the ADA, those state claims would be exempt from ERISA preemption pursuant to ERISA § 514(d)."). Thus, Iwata's state law claim, understood as a claim under section 151B, survives, but she can only prevail on it to the extent that she proves that Intel or Matrix violated both section 151B and some parallel federal law, be it the ADA or the Rehabilitation Act.

Intel and Matrix have argued in their supplemental memorandum that Iwata's chapter 151B would fail under state law, see Defs.' Supp. Mem. at 18-19 (citing Currie v. Hartford Life Ins. Co., No. 00-1831-H, 2002 Mass. Super. LEXIS 306 (Jan. 24, 2002) (Quinlan, J.)), but that argument is untimely.  The Court only sought further briefing on the legislative history behind the federal statutes.

The Court expresses no opinion on the role of Mass. Gen. Laws ch. 151B in applying the ADA's safe harbor provision, under which Title I of the ADA "shall not be construed to prohibit or restrict . . . a person or organization covered by this chapter from establishing, sponsoring, observing or administering the terms of a bona fide benefit plan that are based on underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law."  42 U.S.C. §

12201(c)(2) (emphasis added).  None of the parties has briefed the issue.

**G.   Closing Thoughts**

This case raises a number of complex issues, many of which have yet to be addressed by the parties.  The Court requests that, as the case progresses, the parties work out their legal theories with some rigor.  The Court would also consider entertaining amicus briefs on both sides regarding such issues as the interaction of the federal statutes at issue, the role that state law plays in those statutory schemes, the common law concepts (particularly equitable remedies and defenses) at play in ERISA, the significance of those concepts with regard to the right to a jury trial, and the relevant public policies, as expressed in statutes, regulations, and other federal legal sources.  Similarly, the nature of the Plan -- whether it is funded or unfunded, whether it gives a fiduciary discretionary authority, what the contractual and agency relationships are among the parties -- may play an important role in deciding the outcome of the case.

**III. CONCLUSION**

Accordingly, Intel and Matrix's Motion To Dismiss [Docket No. 6] is ALLOWED as to Iwata's claims under 29 U.S.C. § 1140, but is otherwise DENIED, except insofar as Count IV of Iwata's complaint is limited to the extent that Mass. Gen. Laws ch. 151B is incongruent with the ADA and the Rehabilitation Act.

SO ORDERED.

/s/ William G. Young

WILLIAM G. YOUNG
CHIEF JUDGE